**SOUTHWESTERN ELECTRIC POWER COMPANY,** Petitioner,

v.

**Mur Lee GRANT, Respondent.**

No. 00–0625.

Supreme Court of Texas.

Argued March 7, 2001.

Decided March 28, 2002.

William H. Church, Jr., Thomas S. Leatherbury, Eric Thomas Stahl, Vinson & Elkins, Dallas, Stayton L. Worthington, Coghlan Crowson Fritzpatrick Westbrook & Worthington, Longview, for petitioner.

Joseph L. Rosenfield, Dallas, for respondent.

Justice BAKER delivered the opinion of the Court in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, Justice HANKINSON, Justice O'NEIL and Justice RODRIGUEZ joined.

This case involves a personal-injury claim that Mur Lee Grant, a customer, brought against Southwestern Electric Power Company, a public utility that provides electric service to East Texas, aris-

ing out of a power fluctuation in her home. The issue is whether a provision in SWEPCO's tariff that limits SWEPCO's liability for personal injury damages resulting from power outages or service interruptions is enforceable. The trial court granted SWEPCO's summary-judgment motion based on this tariff provision. The court of appeals concluded that the tariff is *prima facie* unconscionable under the Uniform Commercial Code and that Grant produced enough evidence to raise a material fact issue about whether SWEPCO owed Grant a duty to prevent her injuries. 20 S.W.3d 764. We disagree that, in this case, SWEPCO's tariff limiting liability for personal injury is *prima facie* unconscionable under the UCC. Rather, we conclude that the liability limitation in the tariff here is reasonable as a matter of law and thus enforceable against Grant's negligence claim. Accordingly, we reverse in part and affirm in part the court of appeals' judgment and render judgment for SWEPCO.

## I. BACKGROUND

On June 10, 1995, Grant noticed that lights were flickering and several appliances were not working in her home. Grant called SWEPCO to report trouble with her electrical service. Upon arriving at Grant's home, SWEPCO's representative measured the voltage flowing into the house from the outside meter and found it was steady. Thus, SWEPCO's representative advised Grant to contact an electrician to determine if the problem was in her wiring or appliances.

The electrician found a fluctuating-voltage problem and concluded that it came from SWEPCO's line. SWEPCO's technician returned to Grant's home and also discovered the irregular-voltage problem. Upon checking the surrounding power lines, the technician discovered a tree limb on an adjacent property had fallen and damaged a line. SWEPCO's technician repaired the line and restored regular voltage to the Grant home.

Later, Grant spoke with a SWEPCO customer-service agent, who allegedly assured Grant that a representative would pick up the damaged appliances for repair. When SWEPCO did not come to Grant's home, she again contacted the customer-service agent, who advised Grant that she had to have her appliances checked and, if necessary, repaired. After learning SWEPCO would not repair her appliances, Grant unplugged several appliances and placed them on her kitchen table. Later, as she walked by her kitchen table, Grant alleges she suffered an electrical shock to her face that she claims came from either an unplugged television set, an electrical wall outlet, or a light switch.

Grant sued SWEPCO, claiming that it negligently failed to disconnect Grant's electricity service after it knew the fluctuating voltage had damaged Grant's appliances. SWEPCO moved for a summary judgment under Rules 166a(c) and 166a(i) of the Texas Rules of Civil Procedure. SWEPCO asserted that its tariff precluded liability for personal injuries unless the utility acted with gross negligence or willful misconduct. SWEPCO's tariff, in relevant part, provides:

The Company shall not be liable for damages occasioned by interruption, failure to commence delivery, or voltage, wave form, or frequency fluctuation caused by interruption or failure of service or delay in commencing service due to accident to or breakdown of plant, lines, or equipment, strike, riot, act of God, order of any court or judge granted in any bonafide adverse legal proceedings or action or any order of any commission or tribunal having jurisdiction; or, *without limitation by the preceding*

*enumeration, any other act or things due to causes beyond its control, to the negligence of the Company, its employees, or contractors, except to the extent that the damages are occasioned by the gross negligence or willful misconduct of the Company.*

(emphasis added). The Public Utility Commission approved SWEPCO's tariff. The trial court granted summary judgment for SWEPCO on Grant's negligence claim. The court of appeals affirmed in part, reversed in part, and remanded the case. 20 S.W.3d at 776. The court of appeals determined that Grant alleged negligence claims for her personal-injury damages and property damage to her appliances, but she did not assert a gross-negligence claim. Then, the court of appeals determined that the UCC applies to SWEPCO's tariff, and under the UCC, limiting liability for personal injury in a consumer-goods transaction is *prima facie* unconscionable. 20 S.W.3d at 771; *see also* Tex. Bus. & Com.Code § 2.719(c). Because SWEPCO failed to overcome the *prima facie* presumption, the court of appeals held that SWEPCO's tariff limiting liability for personal injury violated public policy. 20 S.W.3d at 772. But the court of appeals affirmed summary judgment for SWEPCO on Grant's property-damage claim. 20 S.W.3d at 772. Finally, the court of appeals concluded that a material fact issue existed about whether SWEPCO owed Grant a duty, and thus, the court of appeals remanded Grant's personal-injury claim to the trial court. 20 S.W.3d at 776.

We granted SWEPCO's petition for review to determine: (1) whether SWEPCO's tariff, which limits its liability for personal injuries, is *prima facie* unconscionable under the UCC; and, if not, (2) whether such a limitation on liability for ordinary negligence is reasonable.

## II. APPLICABLE LAW

### A. Summary Judgment

■. To prevail on a traditional summary-judgment motion, a movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). A movant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997); *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex.1996).

To prevail on a no-evidence summary-judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's claim. Tex.R. Civ. P. 166a(i). Although the non-moving party is not required to marshal its proof, it must present evidence that raises a genuine fact issue on the challenged elements. *See* Tex.R. Civ. P. 166a, notes and cmts.

### B. State Utilities Regulation

#### 1. Public Utility Regulatory Act

From 1975 to 1999, the Public Utility Regulatory Act existed to "establish a comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities." Tex. Util.Code § 31.001(a). Because electric utilities were regional and service monopolies, the PURA authorized the PUC to regulate utilities as a substitute for competitive forces. *See* Tex. Util.Code § 31.001(b).

The PURA prohibited an electric utility from charging a rate that the PUC did not authorize, granting an unreasonable preference or advantage to persons in a particular service class, or establishing an unreasonable difference in rates between localities or service classes. TEX. UTIL. CODE §§ 36.002, 36.003, 38.021. Moreover, the PURA prohibited an electric utility from raising rates to pass cost increases to retail customers. TEX. UTIL. CODE § 36.201.

The PUC is a legislative creation with only those powers expressly conferred and necessary to accomplish its duties. *See State v. Public Util. Comm'n*, 883 S.W.2d 190, 194 (Tex.1994). The PURA gave the PUC broad powers "to do anything specifically designated or implied by [the PURA] that is necessary and convenient" to the PUC's authority. *See* TEX. UTIL.CODE § 14.001. The PURA also gave the PUC exclusive jurisdiction to regulate utility rates, operations, and services. TEX. UTIL.CODE §§ 32.001(a), 36.001; *see also Houston Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668, 674 (Tex.1999); *Public Util. Comm'n v. AT & T*, 777 S.W.2d 363, 365 (Tex.1989). The PUC required each utility to file a tariff that listed the utility's services and rates and governed the utility's relationship with its customers. TEX. UTIL.CODE § 32.101; 16 TEX. ADMIN. CODE § 23.24. The PUC defined a "tariff" as a schedule containing all charges, rules, and regulations listed separately by type of service and customer class. 16 TEX. ADMIN. CODE § 23.3. The PUC could reject any tariff that did not comply with the PUC's rules and regulations. 16 TEX. ADMIN. CODE § 23.24(g). Once the PUC approved the tariff, an electric utility could not charge a fee or impose any practices, rules, or regulations different from those the tariff described. TEX. UTIL.CODE § 36.004(a); 16 TEX. ADMIN.

CODE § 23.24(b). Furthermore, upon approval, the PUC required that every utility make its tariff publicly available and that the utility's employees assist the public in reviewing the tariffs. 16 TEX. ADMIN. CODE § 23.24(f). To change its rates, standards, classifications, rules, or practices, a utility had to file an amended tariff with the PUC. TEX. UTIL.CODE §§ 36.102, 38.003.

The Legislature amended the PURA in 1999 to deregulate the electricity-generation market and to permit certain electricity providers to compete for customers. SENATE COMM. ON ELEC. UTIL. RESTRUCTURING, BILL ANALYSIS, Tex. S.B. 7, 76th Leg., R.S. (1999). The PURA states that the 1999 amendments may not "interfere with or abrogate the rights or obligations of any party, including a retail or wholesale customer, to a contract with an investor-owned electric utility...." TEX. UTIL.CODE § 39.108. Accordingly, the 1999 amendments do not affect a utility's tariff filed under and governed by the pre 1999 regulatory scheme.

### 2. Filed Rate Doctrine

The "filed-rate doctrine" applies when state law creates a state agency and a statutory scheme under which the agency determines reasonable rates for the service provided. *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 579, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981); *Keogh v. Chicago & Northwestern Ry.*, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922); *Southwestern Bell Tel. Co. v. Metro–Link Telecom, Inc.*, 919 S.W.2d 687, 692 (Tex.App.-Houston [14th Dist.] 1996, writ denied). The doctrine holds that a tariff filed with and approved by an administrative agency under a statutory scheme is presumed reasonable unless a litigant proves otherwise. *See Western Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 572, 41 S.Ct. 584, 65 L.Ed. 1094 (1921); *Wegoland, Ltd.*

*v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994); *Metro–Link Telecom*, 919 S.W.2d at 691. Thus, under the doctrine, filed tariffs govern a utility's relationship with its customers and have the force and effect of law until suspended or set aside. *See Keogh*, 260 U.S. at 162–63, 43 S.Ct. 47; *Carter v. AT & T Co.*, 365 F.2d 486, 496 (5th Cir. 1966); *Metro–Link Telecom*, 919 S.W.2d at 692.

 Additionally, under the filed-rate doctrine, regulated utilities cannot vary a tariff's terms with individual customers, discriminate in providing services, or charge rates other than those properly filed with the appropriate regulatory authority. *Maislin Indus. v. Primary Steel, Inc.*, 497 U.S. 116, 126, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); *Arkansas La. Gas*, 453 U.S. at 577, 101 S.Ct. 2925; *Metro–Link Telecom*, 919 S.W.2d at 692. And a utility's obligations to its customers cannot exceed its duties under a filed tariff. *See Texaco Inc. v. Central Power & Light Co.*, 955 S.W.2d 373, 377 (Tex.App.-San Antonio 1997, pet. denied); *Central Power & Light Co. v. Romero*, 948 S.W.2d 764, 767 (Tex. App.-San Antonio 1996, writ denied); *see also Arkansas La. Gas*, 453 U.S. at 577–78, 101 S.Ct. 2925. It follows, then, that aggrieved customers cannot enforce alleged rights that contradict the tariff's provisions. *Henderson v. Central Power & Light Co.*, 977 S.W.2d 439, 447 (Tex. App.-Corpus Christi 1998, pet. denied). Consequently, the filed-rate doctrine prohibits a customer from suing a utility in contract or tort over issues that a publicly-filed tariff's terms govern. *See AT & T v. Central Office Tel., Inc.*, 524 U.S. 214, 227, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998); *Maislin*, 497 U.S. at 126, 110 S.Ct. 2759.

 A regulatory agency's rate-making authority authorizes it to approve a tariff's provision limiting liability, because a limitation on liability is an inherent part of the rate the utility charges for its services. *See Western Union*, 256 U.S. at 571, 41 S.Ct. 584; *Southwestern Sugar & Molasses Co. v. River Terminals Corp.*, 360 U.S. 411, 417–18, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1958). And, because regulatory agencies have this authority, we have applied the filed-rate doctrine to hold that a tariff provision that limits liability for economic damages arising from a utility's negligence is reasonable. *See Auchan*, 995 S.W.2d at 672–75. In *Auchan*, we considered several factors the PUC has applied to conclude that a tariff can reasonably limit liability for economic damages. 995 S.W.2d at 673–75; *see also* Tex. Pub. Util. Comm'n, *Application of CP & L Co. for Approval of Tariff Amendment*, Docket No. 3198, 7 Tex. P.U.C. Bull. 53, 57–61 (June 22, 1981). We determined that a tariff's limitation on liability for economic damages is reasonable because a utility: (1) must provide nondiscriminatory service to all customers within its area; (2) must maintain uniform rates and reduce costs; (3) cannot accurately estimate its exposure to damages or efficiently insure against risks; (4) cannot increase rates for all customers based on losses one specific class of customers incurs; and (5) must comply with PUC regulations. *Auchan*, 995 S.W.2d at 673–75.

### C. UCC Article 2

Article 2 of the UCC applies to sales that involve a transaction in "goods." Tex. Bus. & Com.Code § 2.102. The UCC defines a "good" as "all things ... which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities ... and things in action." Tex. Bus. & Com.Code § 2.105(a). If the UCC applies to a transaction, the parties can limit or exclude consequential damages arising from the transaction unless the

limitation or exclusion is unconscionable. TEX. BUS. & COM.CODE § 2.719(c). In cases involving consumer goods, a limitation on consequential damages for personal injury is *prima facie* unconscionable, and the defendant must rebut this *prima facie* showing with evidence that the limitation is not unconscionable. TEX. BUS. & COM.CODE § 2.719(c).

But, the UCC does not govern a transaction if applying the UCC would "impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers." TEX. BUS. & COM. CODE § 2.102. Courts have interpreted their states' equivalents to Texas' section 2.102 to mean that article 2 does not apply if it supersedes or weakens special statutes regulating sales to a specified class of buyers. *See, e.g., Olson v. Molacek Bros.,* 341 N.W.2d 375, 378 (N.D.1983); *Pugh v. Stratton,* 22 Utah 2d 190, 450 P.2d 463, 465 (1969). However, article 2 may supplement a specific regulatory statute if it does not conflict with the statute and both article 2 and the statute can be given full effect. *See Farmers Livestock Exchange, Inc. v. Ulmer,* 393 N.W.2d 65, 68 (N.D. 1986); *cf.* TEX. GOV'T CODE § 311.026(a). If article 2 conflicts with a regulatory statute, the regulatory statute prevails, and thus the regulated transaction does not fall within article 2's scope. *See Hughes v. Collegedale Distributors,* 355 So.2d 79, 81 (Miss.1978); *Gimbel v. Kuntz,* 286 N.W.2d 501, 508 (N.D.1979).

## III. ANALYSIS

### A. DOES THE UCC APPLY TO SWEPCO'S TARIFF?

SWEPCO contends that the UCC does not apply here. SWEPCO argues that its utility service is not a "good" under article 2 of the UCC, because its dominant aspect is not the electric current's physical characteristics, but the "services"

that SWEPCO provides. Further, SWEPCO contends that the UCC's general presumptions must give way to specific tariff provisions that the PUC approves under its exclusive jurisdiction. Moreover, SWEPCO asserts that even if the UCC applies to SWEPCO's tariff, the PURA and PUC regulations prohibit SWEPCO from bargaining with its customers to vary the tariff's terms. Thus, SWEPCO argues, SWEPCO could not contract with Grant for additional protections beyond those the tariff specifically provides.

In response, Grant argues that a utility cannot absolve itself from all responsibility for its negligence. Furthermore, Grant asserts that the PUC's approving SWEPCO's tariff does not relieve SWEPCO of the duty to protect a customer from injuries the utility's own negligence causes. Grant argues that a tariff's mere existence cannot shield SWEPCO from liability if it acts in an unreasonable manner. Therefore, Grant contends, the tariff's limitation on liability for personal injury is unconscionable under the UCC.

We disagree with the court of appeals' conclusion that article 2 of the UCC applies here. *See* 20 S.W.3d at 771–72. Rather, we conclude that applying article 2 would impair the comprehensive statutory scheme regulating the sale of electricity to Texas consumers. And the UCC expressly prohibits such an application. TEX. BUS. & COM.CODE § 2.102; *see also Olson,* 341 N.W.2d at 378; *Pugh,* 450 P.2d at 465. The PURA expressly provides that its purpose is to establish "a comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable to the consumers and electric utilities." TEX. UTIL.CODE § 31.002(a). Under the PURA, the PUC controls a utility's rates, operations and services. TEX. UTIL.CODE § 31.001(b). The PUC does so as a substi-

tute for competitive forces that would typically regulate prices in a free enterprise market. *See* TEX. UTIL.CODE § 31.001(b). Thus, unlike contracts for the sale of goods that unregulated companies may enter into in a free market, a public utility can only enter into contracts consistent with the regulatory scheme. Accordingly, applying the UCC would impede the PUC's authority to approve and determine a utility's rates, operations, and services. TEX. UTIL. CODE § 31.001(b).

■ Additionally, the PURA regulatory scheme directly conflicts with UCC section 2.719's prohibiting limitations on personal-injury liability in consumer goods transactions. When a regulatory agency approves a tariff, courts presume, under the filed-rate doctrine, that the tariff is reasonable. *See, e.g., Western Union*, 256 U.S. at 572, 41 S.Ct. 584; *Auchan*, 995 S.W.2d at 672; *Metro–Link Telecom*, 919 S.W.2d at 692. Here, under the pre–1999 PURA, utilities had to submit tariffs for the PUC's approval before conducting business in Texas, and they are bound by those tariffs' terms. *See* TEX. UTIL.CODE §§ 32.101, 36.004; 16 TEX. ADMIN. CODE § 23.24. To apply the UCC's general provision prohibiting limitations on liability to SWEPCO's tariff would directly conflict with the presumption that the tariff is reasonable because the PUC approved it under its ratemaking authority. *See Farmers Livestock Exchange*, 393 N.W.2d at 68. When such a conflict exists, the comprehensive regulatory scheme must prevail over the UCC's general provisions. *See Hughes*, 355 So.2d at 81; *Gimbel*, 286 N.W.2d at 508.

Accordingly, we hold that the UCC does not apply to SWEPCO's tariff. Consequently, the court of appeals erred in holding that UCC section 2.719 requires a conclusion that the tariff's limitation on li-

ability for personal injury is *prima facie* unconscionable.

**B. IS SWEPCO'S TARIFF REASONABLE?**

■ SWEPCO argues that the tariff provision limiting liability for personal injury is enforceable because the PUC, which comprehensively regulates electric utilities' rates and services, approved the tariff. Moreover, SWEPCO contends that because a PUC-approved tariff has the force and effect of law under the filed-rate doctrine, the tariff is presumptively reasonable. SWEPCO reasons that the electric utility industry differs from an unregulated industry in which a company can adjust its prices or services for liability risks. Further, SWEPCO asserts that the PUC carefully defines a utility's duties through its tariff-approval process and does not allow utilities to incorporate personal-injury liability into its rates. Finally, SWEPCO contends that its tariff is reasonable under this Court's *Auchan* analysis. *See Auchan*, 995 S.W.2d at 673–75.

In response, Grant argues that whether a tariff limiting liability for personal injury is reasonable is a question for the factfinder. Moreover, Grant asserts that even if a utility can limit its liability, the utility nevertheless retains a duty to exercise proper precautions to anticipate and prevent injuries to customers. Further, Grant contends that the factors this Court and the PUC have applied to uphold a tariff provision limiting liability dealt solely with liability for economic damages and do not apply to liability for personal-injury damages. Finally, Grant argues that the trial court's granting summary judgment based on SWEPCO's tariff violates the open-courts provision of the Texas Constitution, article I, section 13.

■ We review a tariff's reasonableness as a question of law. *Auchan*, 995

S.W.2d at 671. This Court has never determined whether a provision in a utility's tariff limiting liability for personal injuries is reasonable. However, we have held that a tariff provision limiting liability for economic damages resulting from a utility's negligence was reasonable. *Auchan,* 995 S.W.2d at 675. Likewise, a number of jurisdictions have upheld tariffs absolving utilities from liability for economic damages. *See Auchan,* 995 S.W.2d at 671–72 (citations therein). These jurisdictions only invalidate tariffs that purport to limit a utility's liability for economic damages caused by gross negligence or willful misconduct. *See Auchan,* 995 S.W.2d at 672 (citations therein).

Generally, the courts that have upheld tariff provisions limiting liability for economic damages hold that, when administrative agencies regulate utilities to ensure reasonable rates and nondiscriminatory service, such a liability limitation is presumed reasonable unless a litigant can show otherwise. *See, e.g., Western Union Tel. Co.,* 256 U.S. at 572, 41 S.Ct. 584; *Metro–Link Telecom,* 919 S.W.2d at 691. Similarly, jurisdictions that have upheld a tariff provision limiting liability for personal-injury damages did so because a regulatory agency comprehensively regulated the utility and approved the tariff so it had the force and effect of law. *See Los Angeles Cellular Tel. Co. v. Superior Ct. of Los Angeles County,* 65 Cal.App.4th 1013, 76 Cal.Rptr.2d 894, 897–98 (1998) (holding in a personal-injury suit that a limitation on liability was valid because "by its terms, [the utility's tariff] applies to negligence actions without regard to the nature of the damages sought"); *Landrum v. Florida Power & Light Co.,* 505 So.2d 552, 553–54 (Fla.Dist.Ct.App.1987) (holding in a personal-injury and property-damage suit that "a tariff validly approved by the Public Service Commission, including a limitation on liability for ordinary negligence ... is

valid"). For these reasons, and those discussed below, we agree with these jurisdictions and conclude that SWEPCO's tariff provision limiting liability for personal injury is reasonable.

SWEPCO's tariff provision limiting its personal-injury liability is reasonable because the provision is narrowly drawn and provides a remedy for SWEPCO's gross negligence or willful misconduct. *See, e.g., Landrum,* 505 So.2d at 554; *Computer Tool & Eng'g, Inc. v. Northern States Power Co.,* 453 N.W.2d 569, 573 (Minn.Ct. App.1990) (A limitation for economic damages did not violate public policy because "liability remains for gross negligence as well as willful or wanton acts."); *Lee v. Consolidated Edison Co.,* 98 Misc.2d 304, 413 N.Y.S.2d 826, 828 (1978) (A limitation for economic damages is reasonable "so long as the company has not attempted to absolve itself from its own willful misconduct or gross negligence."). Furthermore, the tariff specifically states that SWEPCO "shall not be liable for damages occasioned by interruption, failure to commence delivery, or voltage, wave form, or frequency fluctuation caused by interruption or failure of service or delay in commencing service...." But it does not exclude personal-injury claims against SWEPCO that arise from SWEPCO's negligence in other contexts. For example, the tariff provision would not shield SWEPCO from liability if an employee, in the performance of his or her duties, injures a person while driving to a job site. Thus, SWEPCO's tariff provision limiting liability does not violate public policy, because it does not purport to relieve SWEPCO from liability under all conceivable circumstances. *See Computer Tool,* 453 N.W.2d at 573.

Some of the factors we relied on in *Auchan* also guide us in determining whether SWEPCO's tariff provision limiting liability for personal-injury damages is

reasonable. *See Auchan,* 995 S.W.2d at 673–75. In *Auchan,* we observed that a tariff prevents a utility from refusing service to customers who have a greater potential for economic damages. *See Auchan,* 995 S.W.2d at 674. Furthermore, we noted that if a utility's customers suffer economic injuries, the utility cannot raise rates to compensate for the losses it incurs if it is found liable. Thus, we concluded a utility's liability exposure could have a direct detrimental effect on its finances. *See Auchan,* 995 S.W.2d at 674; *see also Landrum,* 505 So.2d at 554. Additionally, we recognized that utilities' consumers in a highly-regulated industry have protection, because utilities are subject to strict administrative review and control. *Auchan,* 995 S.W.2d at 674–75. Based on these observations, and other factors not pertinent to our inquiry here, we held that the tariff's limitation on liability for economic damages in that case was reasonable.

The *Auchan* consideration that a regulated utility must provide non-discriminatory service at uniform rates also applies in personal-injury cases. If certain consumers are more likely to suffer personal injuries due to interruptions or fluctuations in electric service, a utility like SWEPCO cannot raise rates or deny service to compensate for these potential losses without the PUC's approval. Rather, the PURA's regulatory scheme requires that a utility provide electricity at uniform rates on a nondiscriminatory basis. *See Arkansas La. Gas,* 453 U.S. at 579, 101 S.Ct. 2925; *Keogh,* 260 U.S. at 156, 43 S.Ct. 47. Thus, a tariff provision limiting liability for personal-injury damages resulting under certain circumstances from a utility's negligence—but not gross negligence or willful misconduct—protects the utility's ability to provide effective, consistent, and nondiscriminatory service.

Moreover, the *Auchan* consideration that the electric utility industry affords consumers protection because the industry is highly regulated likewise applies in personal-injury cases. *Auchan,* 995 S.W.2d at 674–75. The PUC has broad regulatory authority to ensure utilities provide safe, adequate, efficient, and reasonable service. *See* Tex. Util.Code § 38.001. Several PUC regulations provide remedies to consumers and penalize utilities for unsafe or inadequate service. For example, the PUC may institute a formal investigation against a utility on its own initiative or upon a customer's complaint. 16 Tex. Admin. Code § 22.241(a). A customer may complain to the PUC about an electric utility's acts or omissions that violate the PURA or PUC regulations. 16 Tex. Admin.Code § 22.242(a). The PUC resolves these complaints either through an informal proceeding or through a formal complaint process. 16 Tex. Admin. Code § 22.242(c)-(e).

The PUC also imposes administrative penalties on utilities that do not provide safe, adequate, reasonable and efficient service to customers. *See, e.g.,* Tex. Pub. Util. Comm'n, *Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705),* Docket No. 18249 (Apr. 22, 1998) (order on rehearing); Tex. Pub. Util. Comm'n, *Application of Houston Power and Light Co.,* Docket No. 4540, 1982 WL 213186 (Dec. 6, 1982) (final order). These penalties can include lowering a utility's reasonable return on investment capital, adopting minimum performance target levels the utility must meet, adopting customer-service performance benchmarks, requiring quality assurance through independent audits and consultants, and requiring the utility to provide notice to customers about a utility's service quality requirements. *See, e.g.,* Tex. Pub. Util. Comm'n, *Entergy Gulf States, Inc.,* Docket No. 18249, at 27–28.

Our conclusion that SWEPCO's tariff provision limiting liability for personal-injury damages is reasonable does not conflict with *Crowell v. Housing Auth. of Dallas*, 495 S.W.2d 887, 889 (Tex.1973). In *Crowell*, the plaintiff alleged that a defective gas heater in an apartment that the Dallas Housing Authority leased and maintained caused his father to die from carbon-monoxide poisoning. 495 S.W.2d at 888. The court of appeals affirmed the trial court's order granting the Authority summary judgment based on a lease provision limiting the Authority's liability for personal injury and property damage. *Crowell*, 495 S.W.2d. at 888–89. In deciding whether the lease provision violated public policy, we stated that, generally, an agreement exempting a party from liability for negligent injury is void as against public policy. And we noted in *dicta* that the same rule applies to public utilities. *Crowell*, 495 S.W.2d at 889. We then concluded that the lease provision violated public policy because the Authority was a public body organized to provide safe and sanitary accommodations to people with low incomes who had no choice but to accept the lease's terms to have a place to live. *Crowell*, 495 S.W.2d at 889; *cf. Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368 (Tex. 2001) (holding that the Texas Property Code permits a landlord and tenant to contract over who will pay for repairs irrespective of whether the tenant causes the damage).

But the present case is distinguishable from *Crowell*. Unlike the Authority's lease agreement in *Crowell*, SWEPCO's tariff is not a mere contract between SWEPCO and its customers. Rather, the filed tariff that the PUC approved under a statutory scheme acquires the force and effect of law and governs SWEPCO's relationship with its customers. *See Keogh*, 260 U.S. at 162–63, 43 S.Ct. 47; *Carter*, 365 F.2d at 496; *Metro–Link Telecom*, 919

S.W.2d at 692. Moreover, SWEPCO must comply with the PUC's rules that regulate its rates, ensure that it provides non-discriminatory service, and require penalties if SWEPCO provides inadequate or unsafe service. *See* Tex. Util.Code § 38.001; 16 Tex. Admin. Code §§ 22.241(a), 22.242(a), (c)-(e). None of these factors protecting the consumer existed in *Crowell*.

In sum, for all the reasons discussed above, we conclude that SWEPCO's tariff provision limiting liability for personal-injury damages that arise under certain circumstances from SWEPCO's ordinary negligence is reasonable as a matter of law. Consequently, we agree with the trial court's decision to grant SWEPCO's summary-judgment motion on Grant's negligence claim.

## IV. OTHER ARGUMENTS

■■■■ We do not consider Grant's argument that the summary judgment for SWEPCO violated her right to a remedy as the Texas Constitution's open-courts provision guarantees. A litigant must raise an open-courts challenge in the trial court. *See S.V. v. R.V.*, 933 S.W.2d 1, 25 (Tex.1996) (citing *City of San Antonio v. Schautteet*, 706 S.W.2d 103, 104–105 (Tex. 1986)). The record reflects that Grant did not raise her open-courts challenge in her response to SWEPCO's summary-judgment motion. Accordingly, she did not preserve this argument.

■■■ Furthermore, SWEPCO and the PUC as *amicus curiae* ask us to consider the effect that our decision might have on other tariffs utilities have filed under the amended PURA. Specifically, the PUC tells us that under the 1999 PURA amendments, the PUC has adopted a new pro-forma tariff that utilities generally use, incorporating a limitation on liability for personal-injury and economic damages.

16 TEX. ADMIN. CODE § 25.214. However, we cannot do as SWEPCO and the PUC request, because we cannot render advisory opinions. *See Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993).

## V. CONCLUSION

We hold that the UCC does not apply to the SWEPCO tariff provision limiting liability for personal injury resulting from SWEPCO's ordinary negligence; therefore, the limitation on liability is not *prima facie* unconscionable under the UCC. Furthermore, we hold that this tariff provision is reasonable and enforceable as a matter of law under the circumstances identified in the tariff. Therefore, the trial court properly granted summary judgment for SWEPCO on Grant's claims. *See Elliott–Williams Co.,* 9 S.W.3d at 803. Accordingly, we reverse the court of appeals' judgment in part, affirm in part, and render judgment for SWEPCO.

Justice ENOCH filed a concurring opinion, in which Justice JEFFERSON joined.

In Texas, absent actual knowledge, utilities are not liable for dangerous conditions on customers' property.[1] Because SWEPCO had no actual knowledge of any dangerous condition on Grant's property, it owed her no duty as a matter of law. I therefore agree with the Court's judgment. But I am not prepared to go where the Court boldly goes. Because SWEPCO owed no duty, the Court need not decide whether SWEPCO's tariff, which insulates it from liability for personal injury damages, is enforceable. That question I would not decide today.

### I.

Common law negligence "consists of three elements: 1) a legal duty owed by one person to another; 2) a breach of that duty; and 3) damages proximately resulting from the breach."[2] Duty is the "threshold inquiry in a negligence case."[3] Further, whether a duty exists is a question of law for the court to decide—not, as Grant asserts, a question for the jury.[4] It is true that a jury question about a duty's existence can arise where the underlying facts used to determine duty are in dispute.[5] But the underlying facts here are not in dispute: Grant was injured either by her unplugged appliances or an electrical outlet in her home.

A duty can be assumed by contract or imposed by law.[6] The parties do not assert any duty assumed by contract. So we look to whether a duty is imposed by law. The court of appeals, without analysis, found that SWEPCO owed Grant a duty: "Utility companies owe a duty of ordinary care to anticipate and prevent personal injuries caused by their providing services. Whether or not SWEPCO met this duty is a question of fact for a jury to decide."[7] But for almost a century, the law in Texas has been that absent actual knowledge, utilities are not liable for dangerous conditions on customers' property[8]—the duty of care generally ends at the meter box.

**1.** *See San Antonio Gas & Elec. Co. v. Ocon,* 105 Tex. 139, 146 S.W. 162, 164 (1912).

**2.** *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990).

**3.** *Id.*

**4.** *Id.*

**5.** *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 395 (Tex.1991).

**6.** *See, e.g., Elliott–Williams Co. v. Diaz,* 9 S.W.3d 801, 803–04 (Tex.1999).

**7.** 20 S.W.3d at 774.

**8.** *See Ocon,* 146 S.W. at 164; *Huddleston v. Dallas Power & Light Co.,* 93 S.W.2d 199, 200

This is consistent with the judgment of other states that have decided the issue.[9]

But Grant argues that because it is undisputed that SWEPCO knew of her damaged appliances, it had a duty to disconnect electric service to her home to prevent her injuries. There are two responses. First, Grant does not claim that SWEPCO actually knew of any dangerous condition in her home. The only evidence she offers on this point is her electrician's affidavit, which states that "[a]n irregular flow of electricity into any one of the electrical outlets could cause damage to the wiring in the home or could cause damage to the appliances that were plugged into the electrical outlets. Had the problem been discovered by the technician on the initial visit, the electricity could have been disconnected until the problem was found and repaired." In other words, Grant offers testimony that SWEPCO should have known that there might be a problem. That's no evidence that there was a problem. And it's no evidence that SWEPCO had actual knowledge of a problem. Indeed, all of Grant's evidence is to the contrary—not even her own electrician knew of any dangerous condition inside Grant's home. He advised the Grants that their electricity problems were all problems with SWEPCO's lines. Consequently, SWEPCO had no duty to keep Grant from being shocked in her home because there is no evidence that SWEPCO had actual knowledge of any dangerous condition existing in Grant's home.[10] Absent actual knowledge of any dangerous condition, SWEPCO's duties to Grant ended at the meter box.

## II.

In the absence of a duty, there can be no negligence. In the absence of negligence, the negligence/personal injury disclaimer in the tariff is not implicated. Therefore, this Court need not decide whether such a disclaimer is reasonable and enforceable. And it should not.

The Court ventures an opinion on the reasonableness and the enforceability of a personal injury liability exclusion in a utility tariff provision when no other state supreme court nor any federal court has decided that issue. What the Court finds is only two opinions from state intermediate appellate courts that have addressed whether a tariff can limit liability for personal injury damages[11]—hardly settled authority. And neither of these courts confronted whether a utility tariff limiting liability for personal injuries is, as a matter of law, unreasonable or violative of public policy.

The Court hides the dearth of authority in the personal injury context by citing to economic damage cases, which by the mere

(Tex.Civ.App.-Fort Worth 1936, writ dism'd); *Central Power & Light Co. v. Romero*, 948 S.W.2d 764, 767 (Tex.App.-San Antonio 1996, writ denied); *Texaco, Inc. v. Central Power & Light Co.*, 955 S.W.2d 373, 378 (Tex.App.-San Antonio 1997, pet. denied).

9. *See, e.g., Hegwood v. Virginia. Natural Gas, Inc.*, 256 Va. 362, 505 S.E.2d 372, 376–77 (1998); *Marshall v. Dawson Cty. Pub. Power Dist.*, 254 Neb. 578, 578 N.W.2d 428, 431 (1998); *Carter v. Bangor Hydro-Electric Co.*, 598 A.2d 739, 741 (Me.1991); *N.M. Elec. Serv. Co. v. Montanez*, 89 N.M. 278, 551 P.2d 634, 637 (1976); *Naki v. Hawaiian Elec. Co.*, 50 Haw. 416, 442 P.2d 55, 59 (1968); *Reichholdt v. Union Elec. Co.*, 329 S.W.2d 634, 638 (Mo.1959); *Carroway v. Carolina Power & Light Co.*, 226 S.C. 237, 84 S.E.2d 728, 730–31 (1954); *Oesterreich v. Claas*, 237 Wis. 343, 295 N.W. 766, 768 (1941).

10. *See Ocon*, 146 S.W. at 164.

11. *Los Angeles Cellular Tel. Co. v. Superior Ct. of Los Angeles County*, 65 Cal.App.4th 1013, 76 Cal.Rptr.2d 894, 897–98 (1998) and *Landrum v. Florida Power & Light Co.* 505 So.2d 552, 553–54 (Fla.Dist.Ct.App.1987).

fact they are economic damage cases makes them distinct from cases involving personal injury. Both this Court[12] and the Texas Legislature[13] have, in several contexts, recognized that the difference between economic and personal injury damages is significant. Yet the Court today, without so much as a nod to that distinction, essentially holds that *Houston Lighting & Power Co. v. Auchan USA, Inc.,*[14] an economic damages case, controls this, a personal injury case.

I agree with the Court's judgment. But I am unwilling to decide that a utility may, through its tariff, disclaim liability for personal injury damages when precedent is virtually non-existent, our state law otherwise distinguishes economic from personal injury damages, and in order to reach this question, we must skip over a dispositive threshold question, the answer to which is well-settled in Texas. Consequently, I respectfully concur.

---

12. *See Southwestern Ref. Co. v. Bernal,* 22 S.W.3d 425, 436 (Tex.2000) (stating that class actions are "rarely" appropriate for personal injury damages).

13. *See* TEX. BUS. & COM.CODE §§ 2.719(c), 17.45(11).

