COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-05-413-CV

 

 

SCRUGGS MANAGEMENT                                                    APPELLANT

SERVICES,
INC.

 

                                                   V.

 

LLOYD E. HANSON AND                                                        APPELLEES

TIG
INSURANCE COMPANY

 

                                              ------------

 

            FROM
THE 362ND DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I.  Introduction








In nine issues, Appellant
Scruggs Management Services, Inc. (ASM@) asserts
error on the part of the trial court in granting summary judgments in favor of
Appellees Lloyd E. Hanson and TIG Insurance Company and error in the jury=s responses to Jury Question No. 1. 
We affirm.

II.  Factual Background

Lloyd Hanson worked for
twelve years beginning in 1986 in the Reinsurance Department of TIG, an insurance
company based in Irving, Texas.  His job
responsibilities included negotiating, interpreting, documenting, and
accounting for all of TIG=s
reinsurance agreements or treaties. 
During his tenure with TIG, he developed considerable expertise in
keeping track of reinsurance claims and in finding Amissed@ reinsurance
claims.

Hanson served as TIG=s Vice President and Director of Ceded Reinsurance for his last four
years with the company before leaving in 1998. 
As part of his severance package, he agreed to assist TIG whenever he
was needed on reinsurance matters in which he had been involved and was asked
by TIG to do some work on reinsurance matters shortly after he left the
company.








SM is a corporation which
provides, among other things, services to commercial and insurance customers
throughout the United States.  During the
fourth quarter of 1998, Steve Cook, the former Corporate Controller of TIG, (ACook@) introduced
Hanson to Michael Scruggs (AScruggs@) and SM=s Executive Vice President Geoff Banta (ABanta@).  Hanson had recently left TIG=s employment and Cook believed that Hanson might be interested in
employment by SM.  Scruggs and Banta met
with Hanson several times, sometimes with Cook, to determine whether or not
Hanson might make a good fit with SM. 
Hanson represented to Scruggs that if SM hired Hanson, he would help SM
increase the level of services that it was already providing to TIG.  Specifically, Hanson represented that he knew
where tens of millions of dollars of Amissed reinsurance@ recoverables could be located at TIG. 
With that knowledge and SM=s resources and relationship with TIG, Hanson indicated that if SM
employed him, he could help generate millions of dollars of additional revenue
from TIG alone.








Hanson was employed by SM as
of February 1, 1999.  As a condition of
employment in each of Hanson=s positions, he was required to execute an employment agreement.  Each time Hanson=s employment agreement was renewed and extended, he was required to
execute a renewal employment agreement. 
The February 1, 1999 agreement allowed SM to terminate Hanson=s employment for cause on one hour=s notice and to fire him without cause on thirty days= notice.  The agreement also
contained restrictions on Hanson=s ability to work if he left SM, including two year prohibitions on
Hanson (1) soliciting Acovered
customers@[2] in the Arestricted
area@ (a 150-mile radius around any office where Hanson worked or where a
covered customer was present) or (2) working for a competing business in the Arestricted area.@ Finally,
the agreement stated that Hanson Awill be or has been . . . given access to@ certain AProtected
Information@ (trade
secrets and confidential or propriety information) and that he would use such
information for the exclusive benefit of SM.

On or about October 1, 2000,
SM promoted Hanson and elected him to the position of Chief Operating Officer (ACOO@).  That same month Hanson signed a second
employment agreement containing the same provisions as the February 1999
agreement.  Hanson was the COO of SM from
October 1, 2000 through October 8, 2001.








SM asserted that it provided
Hanson, contemporaneously with Hanson=s execution of his employment agreements with password-protected,
secure login privileges to SM=s network, as well as access to all of its hard-copy client and
business planning files.  This provided
Hanson, according to SM, access on his first day of employment to virtually all
of SM=s confidential information, except for SM=s bookkeeping software, financial statements, and human resource
information.  At the time that Hanson was
elected and promoted to COO of SM (October 1, 2000), he allegedly was also
provided with additional login privileges to SM=s network, which included all of SM=s client files, billing and timekeeping software from which all client
services and client needs could be determined, bookkeeping software, financial
statements, and human resource information. 
By the time that Hanson tendered his notice of resignation as the COO of
SM on September 26, 2001, Hanson had access to all of SM=s proprietary and confidential information, including, but not limited
to, financial statements, business plans, marketing plans, human resources
documentation, and client information (past, current, and prospective).

According to Hanson, SM did
not provide him with any trade secrets or confidential or proprietary
information when he signed the February 1, 1999 employment agreement.[3]  Hanson also swore that, during the course of
his employment relationship with SM, he was never given any information that he
was told was a trade secret, confidential, or proprietary and never received
any information that he believed fell into those categories.  Hanson also asserted that SM never gave him
any specialized training.








During Hanson=s first month of employment at SM, he worked with Geoff Banta and Mike
Scruggs to prepare a business development opportunities (ABDO@) plan for
reinsurance.  SM asserted that BDO plans
are among the most secret and proprietary information that any company owns and
were among the most secret and propriety information developed and owned by
SM.  According to SM, these BDO plans,
strategic plans, client proposal and need materials, and client identification
materials provided SM with a competitive advantage over its competitors and
were kept in password protected and restricted access locked file cabinets
(both electronic and paper) in order to protect their secrecy.  This BDO plan formed the basis for the
services that Hanson marketed to customers and prospective customers of SM,
including TIG, during his employment with SM, as well as the services that
Hanson marketed to, and ultimately provided to, TIG and others following the termination
of his employment at SM.

Hanson, while employed by and
on behalf of SM, performed consulting services, including reinsurance services,
for TIG and made proposals to TIG to perform reinsurance related consulting
services.








Hanson submitted his
resignation letter, containing an effective date of October 15, 2001, to SM in
September 2001.  However, SM terminated
Hanson=s employment on October 8, 2001. 
Prior to his resignation, TIG contacted him about a reinsurance matter
to determine whether he had any personal knowledge of the matter from his
previous work for TIG.  TIG told Hanson
that he might be needed for a deposition at some point but no specific request
was made at the time.  Hanson advised SM
of this conversation.  After leaving SM,
Hanson provided background information to TIG and gave deposition testimony on
reinsurance matters that he was personally involved in while he was employed by
TIG.  He also performed work for one of
SM=s clients, Scott Logan and Associates, at the request of Scruggs.

According to SM, Hanson was
employed at great expense to SM, and it made a very significant investment of
time, money, and employee assets to expand and market its capabilities to
provide missed reinsurance consulting, among other services.  SM placed Hanson in the position of SM=s primary marketing contact for SM=s reinsurance services.  Hanson
estimated that it would take one and a half to two years to profitably expand
the reinsurance business at SM.








SM alleged that it incurred
direct costs with Hanson=s employment
in excess of $475,000.  Hanson agreed
that the amounts paid by TIG to Hanson totaled in excess of $350,000 through
September 30, 2003.  According to SM, if
calculated at the same average per month, TIG paid Hanson in excess of $500,000
through December 31, 2004.  Hanson billed
his post-SM time to TIG at the rate of $150 to $175 per hour.  SM had historically billed Hanson=s time to TIG at $300 per hour, and TIG paid such rate.  At SM standard hourly rates agreed to by TIG,
SM would have billed approximately $1 million for Hanson=s services during the same approximately three-year period.  If SM had paid Hanson his highest
post-termination hourly rate of $175 per hour, SM would have earned in excess
of $350,000.[4]

According to Hanson, other
than his work for TIG and Scott Logan and Associates, Hanson had not worked for
or attempted to solicit any client of SM. 
Scruggs testified that, since Hanson=s resignation, (1) SM was not aware of any company client that Hanson
has contacted (other than TIG), (2) SM had not lost any customers that it
attributed to Hanson=s actions,
and (3) SM had not made any proposals to do any type of work for TIG.  Since leaving SM, Hanson urged that he had
not used or attempted to use any of its trade secrets or confidential or
proprietary information.

Hanson argued that TIG would
not have retained SM without Hanson because Hanson=s knowledge and expertise were Aunique,@ Anecessary,@ Arequired,@ Aneeded,@ Aextensive,@ and Agreater than any other person, including former TIG employees.@








Prior to filing this lawsuit,
Hanson never submitted any writing challenging the reasonableness of the scope,
clarity, applicability, or enforceability of any provision of the employment
agreements or any of the restrictions contained therein.  Prior to filing the lawsuit, Hanson never met
with a company representative to discuss a resolution of any such challenge to
the reasonableness of the scope, clarity, applicability, or enforceability of
any provision of the employment agreements or any of the restrictions contained
therein.  Likewise, however, before suing
Hanson, SM never advised him that he was supposedly violating the employment
agreement.

III.  Procedural Background

SM sued Hanson in July 2002
seeking injunctive relief and monetary damages for, among other things, Hanson=s alleged breach of his employment agreement.  Subsequently, SM added TIG as a defendant on
the theory that it had tortiously interfered with the contractual relationship
between Hanson and SM.








On February 13, 2005, the
trial court granted a partial summary judgment for SM on the enforceability of
the employment agreement=s
post-employment restrictions.  However,
on March 15, 2005, the trial court vacated that order and granted summary
judgment for TIG on the tortious interference claim, based on the conclusion
that the promises supporting consideration for the noncompete covenant were
illusory.

Also on March 15, 2005, the
trial court awarded Hanson summary judgment on 
SM=s claims for
(1) tortious interference with existing contractual relations, (2)
misappropriation of trade secrets, and (3) breach of contract.  The trial court granted Hanson=s summary judgment for breach of contract on the basis that, under 31W
Insulation Co. v. Dickie, the promises supporting consideration for the
noncompete agreement were illusory and therefore unenforceable.  144 S.W.3d 153, 158 (Tex. App.CFort Worth 2004, pet. withdrawn). 
A review of the December 10, 2004 motion for summary judgment filed by
Hanson, however, shows that Hanson did not move for summary judgment based on 31W
or any of the following: that there existed no valid contract; that the
noncompete was unenforceable; or that Hanson had not breached the
contract.  Instead, the December 10, 2004
motion for summary judgment shows that Hanson moved for summary judgment on SM=s claim for breach of contract, solely upon the basis that SM suffered
no damages from Hanson=s breach of
contract.








On May 6, 2005, the trial
court heard additional motions for summary judgment and partial summary
judgment:  (1) Hanson=s March 9, 2005 motion for partial summary judgment filed on the basis
that after adequate time for discovery, there was not any evidence of a valid
and enforceable noncompete provision; (2) Hanson=s second motion for partial summary judgment filed April 11, 2005, on
the basis that the John Newton[5]
employment agreement was the same as the Hanson employment agreement and
therefore was unenforceable as a matter of law; (3) TIG=s April 15, 2005 motion for summary judgment was filed on the basis
that there was not any evidence to support SM=s claims of conspiracy; and (4) the April 29, 2005 motion for
reconsideration of summary judgment in favor of TIG on SM=s tortious interference claim.

SM ultimately nonsuited its
conspiracy claims against TIG, and on May 23, 2005, the case proceeded to trial
on the remaining claims against Hanson, all of which arose out of Hanson=s fiduciary duties.  At the
conclusion of the evidence, the court submitted the questions of fact to the
jury.  The jury returned a verdict for
Hanson and the court ordered that SM take nothing from Hanson on all of SM=s remaining claims. 








Originally, the trial court
orally pronounced its orders granting summary judgment; however, due to the
parties= disagreements as to form of the proposed orders, the trial court
incorporated a written order into its final judgment.  The September 7, 2005 final judgment made clear
that the court had granted Hanson=s and TIG=s summary
judgments based upon this court=s opinion in 31W.  Id.  Hanson=s summary judgment for SM=s claimCthat Hanson
had tortiously interfered with the employment agreement between nonparty Newton
and SMCwas awarded on the basis that the noncompetition clause in Hanson=s and Newton=s employment
agreements was unenforceable for want of consideration.  Id. at 158.  Furthermore, the trial court awarded TIG
summary judgment on the basis that the noncompetition clause in Hanson=s and Newton=s employment
agreements was unenforceable for want of consideration, and therefore, no valid
and enforceable contracts existed subject to interference.  Id.

SM timely filed a motion for
new trial, which was denied by the trial court. 
SM then timely filed its notice of appeal.

IV.  Summary Judgment

SM=s first seven issues involve the trial court=s granting of partial summary judgment to Hanson and TIG.  Hanson and TIG argue that the trial court=s granting of summary judgment was proper.








In a summary judgment case,
the issue on appeal is whether the movant met the summary judgment burden by
establishing that no genuine issue of material fact exists and that the movant
is entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a(c); Sw.
Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).  The burden of proof is on the movant, and all
doubts about the existence of a genuine issue of material fact are resolved
against the movant.  Sw. Elec. Power
Co., 73 S.W.3d at 215.

When reviewing a summary
judgment, we take as true all evidence favorable to the nonmovant, and we
indulge every reasonable inference and resolve any doubts in the nonmovant's
favor.  Valence Operating Co. v.
Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  Evidence that favors the movant=s position will not be considered unless it is uncontroverted.  Great Am. Reserve Ins. Co. v. San Antonio
Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex. 1965).

The summary judgment will be
affirmed only if the record establishes that the movant has conclusively proved
all essential elements of the movant=s cause of action or defense as a matter of law.  Clear Creek Basin, 589 S.W.2d at 678.








A defendant who conclusively
negates at least one essential element of a cause of action is entitled to
summary judgment on that claim.  IHS
Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason, 143 S.W.3d
794, 798 (Tex. 2004).  Once the defendant
produces sufficient evidence to establish the right to summary judgment, the
burden shifts to the plaintiff to come forward with competent controverting
evidence raising a genuine issue of material fact with regard to the element
challenged by the defendant.  Centeq
Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995).

The function of summary
judgment practice is not to deprive a litigant of the right to a jury trial,
but to eliminate patently unmeritorious claims and untenable defenses.  Gulbenkian v. Penn, 151 Tex. 412, 252
S.W.2d 929, 931 (1952).  Questions of law
are appropriate matters for summary judgment. 
Rhone-Poulenc, 997 S.W.2d at 222. 
Summary judgment cannot be granted except on the grounds expressly
presented in the motion.  Johnson v.
Brewer & Pritchard, P.C., 73 S.W.3d 193, 204 (Tex. 2002); Sci.
Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 912 (Tex. 1997). 

V.  Damages

SM=s issues one through seven first require us to address whether the
partial summary judgments can be upheld by this court on the basis of SM=s failure to prove damages, even though this is not the articulated
reason the trial court granted the partial summary judgments.  The answer from the Texas Supreme Court is Ayes.@

We
hold that courts of appeals should consider all summary judgment grounds the
trial court rules on and the movant preserves for appellate review that are
necessary for final disposition of the appeal when reviewing a summary
judgment.  See Tex. R. Civ. P. 90(a).  We
further conclude that the appellate court may consider other grounds that the
movant preserved for review and trial court did not rule on in the interest of
judicial economy. 








 

Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 626 (Tex. 1996); see also Baker Hughes, Inc. v.
Keco R. & D., Inc., 12 S.W.3d 1, 5 (Tex. 1999); Westchester
Fire Ins. Co. v. Admiral Ins. Co., 152 S.W.3d 172, 178 (Tex. App.CFort Worth 2004, pet. filed).

The next question is whether
SM raised a fact issue on the question of damages.  The classic measure of contract damages is to
put the injured party in the same economic position it would have been had the
contract been performed.  See, e.g.,
Foley v. Parlier, 68 S.W.3d 870, 884 (Tex. App.CFort Worth 2002, no pet.). 
Furthermore, the measure of actual damages for tortious interference is
the same as for breach of contract:  the
plaintiff can recover those damages that will put it in the same economic
position it would have occupied absent the interference.  Am. Nat=l Petroleum Co. v. Transcon. Gas Pipe Line Corp., 798 S.W.2d 274, 278 (Tex. 1990). 
A plaintiff seeking to recover for tortious interference with a
noncompete agreement must establish proximate causation and damages with
evidence rising above mere suspicion or speculation.  See B. Cantrell Oil Co. v. Hino Gas Sales,
Inc., 756 S.W.2d 781, 784 (Tex. App.CCorpus Christi 1988, no writ), superseded by statute on other
grounds. 








SM argues that the income
that would have been derived from TIG after Hanson left SM=s employment constituted its damages. 
Under the circumstances of this case, that is incorrect.  Had Hanson breached his contract with SM
by leaving the firm, such as by an unauthorized resignation before
his contract expired, then SM would theoretically be entitled to the income
that SM would have generated from his continued employment.  See Foley, 68 S.W.3d at 884.   However, SM does not argue that Hanson=s departure was a breach of the terms of the contract,[6]
meaning that this is not the correct measure of damages.  On the contrary, SM argues that Hanson=s postemployment work  for TIG
was the breach of contract.  Thus, SM was
required to show that Hanson=s postemployment work for TIG somehow caused SM damage, such as by
taking clients or business away from SM. 
See B. Cantrell Oil, 756 S.W.2d at 784 (discussing proximate
cause and damages in relation to a noncompete agreement).  This SM did not prove.  








The summary judgment evidence
showed that the work performed by Hanson was associated with his personal
knowledge based on his prior experience at TIG and had nothing to do with his
employment at SM.  In other words, once
he properly left TIG, he could work for anyone as long as it did not damage
SM.  Hence, this work did not damage SM
because he was not taking away business from SM; rather, TIG hired Hanson for
his personal experience, whether Hanson had worked at SM or not.  Specifically, SM never made any proposal to
do work for TIG after Hanson=s departure because SM had aggressively and unsuccessfully pitched
their services to TIG during Hanson=s tenure.  Further, SM did not
prove that it had lost customers of significance that it could attribute to
Hanson, and TIG showed that it would not have hired an outside consulting firm,
such as SM, to do the work performed by Hanson. Moreover, SM failed to provide
any competent evidence of any damages on account of Hanson=s alleged interference with Newton=s contract.  Therefore, SM has
failed to establish proximate causation and damages in relation to the
noncompete agreement.  See id.   

Because SM failed to raise a
fact issue as to damages for its first seven issues, the trial court=s granting of summary judgment on those claims was appropriate.  Therefore, we need not assess whether the
noncompete agreement is enforceable or whether Hanson waived the requirements
of the covenants not to compete act.  We
overrule SM=s issues one
through seven. 

VI.  The Jury Verdict








In its eighth and ninth
issues SM complains that the jury verdict in favor of Hanson on its cause of
action for breach of fiduciary duty was against the great weight and
preponderance of the evidence or the evidence was legally and factually
insufficient to support the jury=s verdict.[7]

A. Burden of Proof on the
Breach of Fiduciary Duty Claim

SM contends that Hanson,
while an officer and fiduciary of SM, breached his fiduciary duty by usurping a
corporate opportunity.  Moreover, SM
argues that even if there is no evidence other than the existence of a
fiduciary duty and the occurrence of a transaction by the fiduciary, SM must
prevail.  We disagree.








To establish a breach of a
fiduciary duty by usurping a corporate opportunity, the corporation must prove
that an officer or director misappropriated a business opportunity that
properly belongs to the corporation. Int=l Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, 576B78 (Tex. 1963), superseded by statute on other grounds;
Alexander v. Sturkie, 909 S.W.2d 166,
169 (Tex. App.CHouston [14th Dist.] 1995, writ denied).  The business opportunity arises where a
corporation has a legitimate interest or expectancy in, and the financial
resources to take advantage of, a particular business opportunity.  Dyer v. Shafer,
Gilliland, Davis, McCollum & Ashley, Inc., 779 S.W.2d 474,
477 (Tex. App.CEl Paso 1989, writ denied).








SM was required
prove that Hanson misappropriated a business opportunity that belonged
to SM to establish its breach of fiduciary duty claim.  See Int=l Bankers,
368 S.W.2d at 576B78; Alexander, 909
S.W.2d at 169.  Thus, the mere showing
that Hanson was a fiduciary and that there was a transaction by Hanson is not
enough.  As detailed above, the
work performed by Hanson for TIG was based upon his personal knowledge and
prior experience at TIG and had nothing to do with his employment at SM.[8]  Because the work was personal to Hanson and
because Hanson=s departure from SM was not a
breach of contract, SM had no expectancy
in the work performed by Hanson for TIG.  Dyer, 779 S.W.2d at 477.  Furthermore, SM was unsuccessful in its
attempts to gain TIG=s business during Hanson=s tenure at SM and made no proposals to do work for TIG
after Hanson=s departure. 
Therefore, SM failed to prove that
Hanson misappropriated a business opportunity that properly belonged to
SM.  Int=l Bankers, 368 S.W.2d at 576B78; Alexander, 909
S.W.2d at 169.  

B. Great Weight and Preponderance and Legal
Sufficiency of the Evidence

In reviewing an issue asserting that a finding
is Aagainst
the great weight and preponderance@ of
the evidence, we must consider and weigh all of the evidence and set aside the
finding only if the evidence is so weak or the finding is so contrary to the
great weight and preponderance of the evidence as to be clearly wrong and
unjust.  Dow Chem. Co. v. Francis,
46 S.W.3d 237, 242 (Tex. 2001); In re King's Estate, 150 Tex. 662, 244
S.W.2d 660, 661 (1951).  Generally, we do
not have to detail supporting evidence when upholding factual sufficiency of
the evidence underlying the trial court's judgment.  Ellis County State Bank v. Keever, 888
S.W.2d 790, 794 (Tex. 1994). 








A legal sufficiency challenge may only be
sustained when (1) the record discloses a complete absence of evidence of a
vital fact (2) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact (3) the evidence
offered to prove a vital fact is no more than a mere scintilla or (4) the
evidence establishes conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No Evidence" and
"Insufficient Evidence" Points of Error, 38 TEX. L. REV. 361, 362B63 (1960). 
In determining whether there is legally sufficient evidence to support
the finding under review, we must consider evidence favorable to the finding if
a reasonable fact-finder could, and disregard evidence contrary to the finding
unless a reasonable fact-finder could not. 
City of Keller v. Wilson, 168
S.W.3d 802, 827 (Tex. 2005). 

Here, the evidence showed that Hanson performed
work for TIG after his tenure with SM had concluded.  The work Hanson did for TIG consisted of
specific litigation testimony related to Hanson=s
specialized factual knowledge of TIG=s
contracts.  At trial, SM conceded that it
could not give a deposition as a fact witness for TIG.  Thus, the work Hanson performed was not work
that SM could have performed.  Other than
these specific litigation needs, TIG never contacted Hanson about any other
work, including missed reinsurance work. 
Based upon its verdict, the jury reasonably found these specific
fact-based assignments were unique to Hanson and did not constitute SM=s
corporate opportunities.   








We hold that the trial court=s
judgment that Hanson did not breach his fiduciary duty was supported by legally
sufficient evidence and was not contrary to the great weight and preponderance
of the evidence.  We overrule SM=s
eighth and ninth issues.

VII.
Conclusion

Having
overruled SM=s nine issues, we affirm the judgment of
the trial court.  

 

 

 

BOB MCCOY

JUSTICE

 

PANEL
A:    LIVINGSTON, WALKER, and MCCOY, JJ.

 

DELIVERED: November 30, 2006

 

 

 











[1]See Tex.
R. App. P. 47.4.





[2]The agreement defined a Acovered customer@ as any entity or person who
engaged in or contemplated engaging in business with SM in the last thirty
months of Hanson=s employment and from who SM
received Aprotected information@ or with whom Hanson had contact.





[3]Scruggs submitted an affidavit
disputing this point.





[4]The
calculation consists of 2,857 hours billed by Hanson ($500,000/$175 per
hour=2,857 hours) x $125 per hour reserved to SM=$357,142 in net income for
post-termination services provided by Hanson to TIG.





[5]Newton was also an employee of
SM.  Hanson and Newton coauthored a joint
resignation letter to SM.





[6]In fact SM Aterminated@ Hanson=s
employment October 8, 2001.





[7]When the party having the burden of
proof on a fact finding appeals from an adverse fact finding, the issue or
point challenging the factual sufficiency of the evidence should be that the
finding was Aagainst the great weight and
preponderance of the evidence.@  Croucher v.
Croucher, 660 S.W.2d 55, 58 (Tex. 1983).

Nonetheless, because
the Texas Supreme Court=s practice is to liberally construe
the issues or points contained in appellate briefs, an inappropriately phrased
point should be construed as raising a challenge to the factual sufficiency of
the evidence where the error is Areadily apparent from the argument briefed.@ 
Pool v. Ford Motor Co., 715 S.W.2d 629, 633 (Tex. 1986) (op. on
reh'g); see Tex. R. App. P. 38.1(e).





[8]Scruggs did testify that SM could
do any of the work performed by Hanson after he left SM.  However, the jury is the sole judge of
credibility of the witnesses and the weight of their testimony and had the
right to disregard Scruggs=s testimony.  See,
e.g., State Indus., Inc. v. Corbitt, 925 S.W.2d 304, 310 (Tex. App.CHouston [1st Dist.] 1996, no writ).