COURT
OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO. 2-02-037-CV
 
DIANE DAVIS ECKELS AND JOHN BYRON DAVIS       
           
           
APPELLANTS
V.
MARCEIL BREWSTER DAVIS AND PAUL HESSE       
           
           
    APPELLEES
WELCH, INDIVIDUALLY AND AS INDEPENDENT
CO-EXECUTORS UNDER LAST WILL AND
TESTAMENT OF J.B. DAVIS, AND PAUL HESSE
WELCH, INDIVIDUALLY AND AS CO-TRUSTEE
OF THE J.B. DAVIS LIVING TRUST
----------
FROM PROBATE COURT NO. 1 OF TARRANT COUNTY
----------
OPINION
----------
I. Introduction
       
This is a summary judgment appeal from a declaratory judgment action construing
the terms of a living trust. The trust identified two numbered accounts at a
financial management company as the trust corpus. The primary issue we address
in this appeal is whether the financial management company's unilateral act of
renumbering one of the accounts for internal bookkeeping reasons transformed the
assets in the renumbered account into non-trust assets. We hold that the
renumbering of the account created a latent ambiguity, which was properly
resolved by the admission of extrinsic evidence, and did not indicate any change
in J.B. Davis's intent to distribute the account's assets through the terms of
the trust. Therefore, we will affirm the trial court's judgment.
II. Factual
and Procedural Background
       
On February 25, 1993, J.B. Davis ("Settlor") executed the "J.B.
Davis Living Trust" (hereinafter "Trust"). Exhibit A attached to
the Trust document indicates that the following assets were to be delivered to
the Trust to fund it:

 Delivered to the [Living] Trust at
 execution of the Trust document are all the assets in two accounts held in
 custody by Charles Schwab of Dallas, Texas and Morgan Keegan & Co. of
 Pensacola, Florida, each subject to a Discretionary Investment Advisory
 Agreement with Fiduciary Financial Services of the Southwest, Inc. of Dallas,
 Texas and designated by that latter firm as Account Number 1716 and Account
 Number 1717.

On December 30,
1992, in preparing to create the Trust, Settlor changed the custodian of his
Charles Schwab account to Morgan Keegan. Following the Trust's creation on
February 25, 1993, the assets in the Charles Schwab account were transferred to
the new Morgan Keegan account number 45203031, and the Charles Schwab account
was closed.
       
The Trust was funded on or about April 16, 1993. At that time, the two accounts
referenced in Exhibit A to the Trust document consisted of (1) a rollover IRA
with Morgan Keegan & Co. containing approximately $690,000, which Morgan
Keegan identified as account number 75902072 and which Fiduciary Financial
Services of the Southwest (hereinafter "FFSS") designated as account
number 1716; and (2) an individual account at Morgan Keegan containing
approximately $345,000, which Morgan Keegan identified as account number
45203031 and FFSS designated as account number 1717. FFSS provided discretionary
investment advisory services for these two accounts, while Morgan Keegan held
custody of the assets in each of the accounts.
       
Originally, the terms of the Trust, specifically paragraph 2.04, provided that
the Trust would terminate upon the death of both Settlor and his wife, Marceil
Brewster Davis ("Marcy"), with the remaining assets to then be
distributed equally between Settlor's children from a previous marriage, Diane
Davis Eckels ("Eckels") and John Byron Davis ("Davis"). On
April 1, 1993, before the trust was funded, however, Settlor amended paragraph
2.04 of the Trust (hereinafter "Trust Amendment") to provide as
follows:

        
 If not earlier terminated by distribution of all of the assets of this Trust
 under other provisions hereunder, this Trust shall terminate ninety (90) days
 following the death of the Settlor at which time the corpus and undistributed
 income remaining shall be distributed as follows:
 
 From my IRA Rollover account, #1716, I
 hereby direct that $300,000 shall be distributed to separate IRA accounts
 for each of my two children, JOHN BYRON DAVIS of Baker,
 Louisiana and DIANE DAVIS ECKELS of Houston, Texas. This
 totals $600,000. Should there be less than $600,000 in the IRA account at
 the date of my death, I direct the trustee to make up the difference out of
 my Individual Account, #1717. If there is an excess of $600,000 in my IRA
 Rollover account, I direct that the remainder be given to my wife, MARCEIL
 BREWSTER DAVIS. Further, she will receive all of the assets in my
 Individual Account #1717, that [are] not used to make up any deficiency in
 my IRA Rollover Account.
 

 
       
Sometime after the Trust Amendment was executed, Morgan Keegan assigned
Settlor's Individual Account a new account number, changing it from 45203031 to
19015304, to reflect its designation as a trust account. When Morgan Keegan
renumbered its account, FFSS also opened a new account, number 2095, to
correspond to the new account number assigned by Morgan Keegan. Once all of the
assets were transferred and reflected in the new accounts, FFSS closed account
1717. Settlor did not amend the Trust to reflect the account number change by
FFSS.
       
Settlor died on August 2, 1998. When the Trust terminated ninety days later,
Settlor's IRA Rollover Account, which was held in the custody of Morgan Keegan
in account 75902072 and designated by FFSS as account 1716, had a balance in
excess of $900,000, and his Individual Account, also in the custody of Morgan
Keegan in account 19015304 and designated by FFSS as account 2095, had a balance
of $363,662.53. Settlor's attorney, Paul Hesse Welch ("Welch"), and
Settlor's brother, Stuart Switzer Davis,(1)
acting as successor co-trustees for the Trust, distributed $600,000 from the IRA
Rollover account, or FFSS account 1716, to Settlor's children, Eckels and Davis,
and distributed the balance of the assets in this account and all of the assets
in the Individual Account, or FFSS account 2095, to Settlor's wife, Marcy.
       
Appellants Eckels and Davis filed a declaratory judgment action, asserting that
FFSS account 2095, containing assets worth $363,662.53, was erroneously
distributed entirely to Marcy under the terms of the Trust when one-third of the
$363,662.53 should have passed to each of them under the terms of their father's
will.(2) Eckels and Davis filed a motion for
summary judgment claiming that the Trust only authorized distribution of the
assets in FFSS account 1717 to Marcy and that because FFSS account 1717 ceased
to exist when it was closed in 1994, the Trust language giving Marcy all the
assets in FFSS account 1717 was not applicable to account 2095. Therefore, they
claimed that FFSS account 2095 passed outside the Trust.
       
Appellees Marcy and Welch also sought summary judgment, asserting that the
account numbers were used in the Trust only to distinguish between Settlor's IRA
Rollover Account assets and his Individual Account assets. Marcy and Welch
argued that an ambiguity existed in the Trust language in that it could be
construed as disposing of Settlor's Individual Account, no matter what its FFSS
number, or it could be read as disposing of only FFSS account number 1717. In
light of this alleged ambiguity, Marcy and Welch claim that the trial court
should, and properly did, look at extrinsic evidence showing Settlor's intent to
distribute his Individual Account to Marcy, so long as his children had already
received $300,000 each.
       
The trial court denied Eckels and Davis's motion for summary judgment, overruled
Eckels and Davis's objections to the extrinsic summary judgment evidence relied
upon by Marcy and Welch in support of their motions for summary judgment, and
granted summary judgment for Marcy and Welch. Eckels and Davis raise five issues
on appeal challenging the trial court's summary judgment for Marcy and Welch and
its denial of their motion for summary judgment.
III. Standard
of Review
       
In a summary judgment case, the issue on appeal is whether the movant met his
summary judgment burden by establishing that no genuine issue of material fact
exists and that the movant is entitled to judgment as a matter of law. Tex. R.
Civ. P. 166a(c); S.W. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215
(Tex. 2002); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d
671, 678 (Tex. 1979). Summary judgment is proper when parties do not dispute the
relevant facts. Havlen v. McDougall, 22 S.W.3d 343, 345 (Tex. 2000).
       
When both parties move for summary judgment and the trial court grants one
motion and denies the other, the reviewing court should review both parties'
summary judgment evidence and determine all questions presented. Dow Chem.
Corp. v. Bright, 89 S.W.3d 602, 605 (Tex. 2002). The reviewing court should
render the judgment that the trial court should have rendered. Id. When
a trial court's order granting summary judgment does not specify the ground or
grounds relied on for its ruling, summary judgment will be affirmed on appeal if
any of the theories advanced are meritorious. Star-Telegram, Inc. v. Doe,
915 S.W.2d 471, 473 (Tex. 1995); Harwell v. State Farm Mut. Auto. Ins. Co.,
896 S.W.2d 170, 173 (Tex. 1995).
IV. Ambiguity
of Living Trust
       
In their first, second, and fourth issues, Eckels and Davis complain that the
trial court erred by impliedly determining that the Trust Amendment was
ambiguous, by considering extrinsic evidence of Settlor's intent, and by
overruling their objections to Marcy and Welch's summary judgment evidence. We
address these issues in turn.
A.  Rules of Construction
for Determining Ambiguity
       
Eckels and Davis do not dispute that the assets from Settlor's Individual
Account 1717 were, in fact, transferred to account 2095 following the Trust's
creation. Rather, their contention is that the rules of construction, when
correctly applied, show the clear intent of Settlor that account 2095 pass under
Settlor's will in equal thirds to Marcy, Eckels, and Davis. Eckels and Davis
also maintain that San Antonio Area Foundation v. Lang is controlling
and that under Lang the trial court erred in finding a latent ambiguity
in the trust documents and in considering extrinsic evidence. 35 S.W.3d 636, 640
(Tex. 2000) (holding that the term "real property" is clear and
unambiguous based on definitions from the Probate Code and the Property Code).
       
Marcy and Welch, on the other hand, maintain that FFSS account 2095 should be
construed as the same account as FFSS account 1717 for purposes of distribution
under the Trust, as amended, because the account numbers are not controlling,
the assets are substantially the same, and the Settlor's intent was for Marcy to
receive the balance of his investment accounts.
       
The rules of construction of wills and trusts are well settled. Hurley v.
Moody Nat'l Bank of Galveston, 98 S.W.3d 307, 310 (Tex. App.--Houston [1st
Dist.] 2003, no pet.). The construction of a will or a trust instrument is a
question of law for the trial court. Id. (citing Nowlin v. Frost
Nat'l Bank, 908 S.W.2d 283, 286 (Tex. App.--Houston [1st Dist.]
1995, no writ)). A court must construe both wills and trusts to ascertain the
intent of the maker. Id. (citing Jewett v. Capital Nat'l Bank,
618 S.W.2d 109, 112 (Tex. Civ. App.--Waco 1981, writ ref'd n.r.e.)). The intent
of the settlor must be ascertained from the language used within the four
corners of the instrument. See Shriner's Hosp. for Crippled Children of Tex.
v. Stahl, 610 S.W.2d 147, 151 (Tex. 1980) (applying this concept to
construe a will). All terms must be harmonized to properly give effect to all
parts. Hutton v. Methodist Home, 615 S.W.2d 289, 292 (Tex. Civ.
App.--Fort Worth 1981, writ ref'd n.r.e.). If possible, the court should
construe the instrument to give effect to all provisions so that no provision is
rendered meaningless. Myrick v. Moody, 802 S.W.2d 735, 738 (Tex.
App.--Houston [14th Dist.] 1990, writ denied). If the language of a
trust is unambiguous and expresses the intent of the settlor, it is unnecessary
to construe the instrument because it speaks for itself. Hurley, 98
S.W.2d at 310 (citing Jewett, 618 S.W.2d at 112). If, on the other
hand, the meaning of the instrument is uncertain or "reasonably susceptible
to more than one meaning," the instrument is ambiguous. Myrick,
802 S.W.2d at 738.
       
Because the precise language at issue is contained in the Trust Amendment, we
again set forth that amendment:

 From my IRA Rollover account, #1716, I
 hereby direct that $300,000 shall be distributed to separate IRA accounts for
 each of my two children, JOHN BYRON DAVIS of Baker, Louisiana
 and DIANE DAVIS ECKELS of Houston, Texas. This totals
 $600,000. Should there be less than $600,000 in the IRA account at the date of
 my death, I direct the trustee to make up the difference out of my Individual
 Account, #1717. If there is an excess of $600,000 in my IRA Rollover account,
 I direct that the remainder be given to my wife, MARCEIL BREWSTER
 DAVIS. Further, she will receive all of the assets in my Individual
 Account #1717, that [are] not used to make up any deficiency in my IRA
 Rollover Account.

       
When applying the rules of construction to the four corners of the Trust
document as a whole, it is clear that Settlor had two accounts--his IRA Rollover
Account and his Individual Account--that were to comprise the corpus of the
Trust and that were to be disposed of through the Trust. In attempting to
harmonize the terms of the Trust to give effect to all parts, we note that
Settlor did not identify the two accounts by reference to the custodian of the
accounts in the Trust Amendment as he did in the original Trust document.
Instead, he referred to the two accounts as his IRA Rollover Account and his
Individual Account, while still linking each of these accounts to his FFSS
accounts 1716 and 1717.
       
Construing the terms of the Trust to ascertain Settlor's intent, it appears that
Settlor's primary objective was to ensure that each of his children received
$300,000 from the Trust and that Marcy received the balance of the Trust.
Settlor directed that $300,000 be paid from his IRA Rollover Account to each of
his children. At the time he executed the Trust Amendment, however, he had no
way of knowing whether his IRA Rollover Account would be able to fund the entire
$600,000. Settlor provided for this contingency in the Trust Amendment by
directing that the $600,000 would be paid first from his IRA Rollover Account,
with any deficiency being paid out of his Individual Account. Settlor also
provided in the Trust Amendment for the contingency that the IRA Rollover
Account might have in excess of $600,000 at the time of his death by providing
that his wife, Marcy, would receive any excess that remained in his IRA Rollover
Account after payment to Eckels and Davis. He then disposed of all remaining
assets in his Individual Account by providing in the Trust Amendment that Marcy
"will receive all of the assets in my Individual Account #1717, that [are]
not used to make up any deficiency in my IRA Rollover Account."
       
Additionally, Settlor attempted to ensure that these assets would not be
transferred or removed from the Trust by FFSS, Morgan Keegan, or anyone else
because he retained for himself, as trustee, the power to remove assets from the
Trust. In spite of this provision in the Trust, FFSS unilaterally transferred
the assets from account 1717 into a new account after the date of the Trust
Amendment. Consequently, the account number reflected in the trust documents for
the Individual Account did not exist at the time the co-trustees were to
administer the Trust, but the assets of the Individual Account, which were still
titled in the name of the Trust, did exist. Because "my Individual Account,
#1717" is susceptible to more than one meaning, i.e., either the assets in
Settlor's Individual Account or in Account #1717, we hold that an ambiguity
exists in the Trust language.
       
If the court determines that the document is ambiguous, the resulting ambiguity
can be classified as either patent or latent. A patent ambiguity is one apparent
on the trust's face. In re Estate of Brown, 922 S.W.2d 605, 608 (Tex.
App.--Texarkana 1996, no writ) (dealing with patent ambiguity in a will). A
patent ambiguity arises on the reading of the trust from the words themselves. Id.
A latent ambiguity exists when the trust appears to convey a sensible meaning on
its face, but it cannot be carried out without further clarification. Id. at
608-09; see also Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907
S.W.2d 517, 520 (Tex. 1995) (stating that an example of latent ambiguity would
be if a contract called for goods to be delivered to "the green house on
Pecan Street," but there were in fact two green houses on Pecan Street).
       
We conclude that the Trust Amendment contained a latent ambiguity. Although it
appears on its face to convey a sensible meaning, it cannot be carried out
without clarification because the change in account numbers raises the question
of whether Settlor's intent pertained to the specific account number (e.g.,
account 1717) or to the type of assets held by the account (e.g.,
Individual Account), regardless of the number given to the Individual Account.
       
Eckels and Davis assert that no ambiguity exists because, under Lang,
we must apply the probate code's definition of "account" and
application of that definition renders the Trust language unambiguous. Lang,
35 S.W.3d at 640. According to Eckels and Davis, "account" cannot be
construed to include #2095. The probate code defines "account" as
"a contract of deposit of funds between a depositor and a financial
institution." Tex. Prob. Code Ann. § 436(1) (Vernon 1980). Application of
that definition to the present Trust language does not resolve, but only further
highlights, the latent ambiguity. Settlor had only one "contract of deposit
of funds" regarding the assets held in his Individual Account. The contract
for the deposit of funds included those funds, regardless of any
unilateral, internal new number given to the funds. Thus, we hold that Lang
does not control the present facts.
       
Citing Mitchell v. Mitchell, Eckels and Davis also contend that the
Trust language should not be construed as ambiguous because the Trust was
drafted by a lawyer. 244 S.W.2d 803, 806 (Tex. 1951). We decline to follow their
reasoning because they misinterpret Mitchell. Mitchell holds
that when the meaning of language used in a will is settled by usage and the
sense that the law has given to it, the language should be so construed, unless
the context of the will shows a clear intention to the contrary. Here, Eckels
and Davis point to no language that is settled by usage. We overrule Eckels and
Davis's first point.
B.  Extrinsic Evidence
Conclusively Establishes
Settlor's Intent
       
In their fourth point, Eckels and Davis argue in the alternative that even if
there was an ambiguity in the trust documents, then a fact issue exists on
Settlor's intent with respect to account 2095. Where there is latent or patent
ambiguity, it is proper for courts to admit extrinsic evidence to show the
settlor's intent. In re Estate of Cohorn, 622 S.W.2d 486, 487-88 (Tex.
App.--Eastland 1981, writ ref'd n.r.e.) (admitting extrinsic evidence where
there was latent ambiguity in a will construction case to show the intent of the
parties to devise a tract of land). Moreover, the court may always receive and
consider evidence concerning the circumstances existing when the trust was
written that will enable the court to place itself in the settlor's position at
the time and thus to determine the sense in which the words were used by the
settlor. See In re Estate of O'Hara, 549 S.W.2d 233, 238 (Tex. Civ.
App.--Dallas 1977, no writ) (citing Stewart v. Selder, 473 S.W.2d 3, 7
(Tex. 1971)) (applying this concept in the context of construing a will to
determine whether a bequest was to a foundation or to a museum with a similar
name).
       
Words may be considered ambiguous only if the meaning remains unclear after
extrinsic evidence is received and considered. Id. at 238. The supreme
court has declared that construction of a written instrument is ordinarily a
question of law for the court, and even if it contains language on its face
ambiguous, but extrinsic evidence of circumstances is undisputed, construction
of the instrument is still a question of law for the court. Id.
       
When extrinsic evidence and the evidence of the circumstances existing when the
Trust was written are considered in this case, including letters written by
Settlor in 1992 and 1993, the evidence shows without dispute that as early as
1992 Settlor had determined how he wanted his assets divided, which included
giving $300,000 to each of his children and leaving the remainder of his assets
to his wife, Marcy. In 1993, Settlor then executed trust documents in line with
the intent that he set forth in his letters and confirmed that his trust
documents evidenced his intent by writing additional letters to his attorney
after the documents were signed.(3) 
Moreover, the evidence presented through Kathy Boobar's affidavit and the
deposition testimony of Welch and Boobar further shows that the change in
account numbers was an internal, unilateral change in form required by the
management company and not a change in Settlor's intent.(4)
       
We are required to subordinate form to substance. Flower v. Dort, 260
S.W.2d 685, 688 (Tex. Civ. App.--Fort Worth 1953, writ ref'd n.r.e.). The fact
that the form of assets may change over time does not defeat Settlor's intent of
disposing of the assets. Id. at 688-90 (holding that where testatrix
merely changed the estate from money to bonds and other securities the change in
form would not defeat the dominant purpose in her will of leaving her husband's
relatives one-half of $40,000 or one-half of the remainder of the estate).
Similarly, the fact that designated assets may be transferred to a new account
or assigned a new account number will not defeat the general intent to dispose
of those same assets where the assets themselves have not changed and are titled
as part of the Trust. After all, it is the intention of the settlor that
controls, and his intention must be ascertained by considering the entire
instrument, not just a single clause. Id.
       
Even if we agreed with Eckels and Davis that the bequest of assets in FFSS
account 1717 was specific to the account number, we nonetheless agree with
Welch's and Marcy's contention that no ademption occurred. Only the alienation
or disappearance of the subject matter of a specific devise or bequest from the
settlor's estate adeems the devise or bequest. Stahl, 610 S.W.2d at
150. Here, the assets that were the subject of FFSS account 1717 had not been
disposed of, alienated, nor had they disappeared at the time of Settlor's death;
only the account number was changed. Where, as here, the property which is the
subject of the trust corpus is present at the settlor's death, there is no
ademption. Bates v. Fuller, 663 S.W.2d 512, 516 (Tex. App.--Tyler 1983,
no writ) (op. on reh'g). The assets, therefore, were not adeemed.
       
From the evidence, it appears that reasonable minds could not differ with the
conclusion that when Settlor provided account names and numbers for each asset,
he intended for the asset to be distributed in the manner described in the
Trust, regardless of the account number. Eckels and Davis's narrow construction,
focusing exclusively on the account numbers, contravenes the intent expressed by
Settlor. We must avoid a construction which contravenes the intent expressed in
the document as a whole. Lane v. Sherrill, 614 S.W.2d 619, 623 (Tex.
Civ. App.--Austin 1981, no writ). Therefore, we agree with Marcy and Welch that
the extrinsic evidence, which was properly considered by the trial court,
conclusively proved that Settlor wanted to move the assets of two existing
brokerage accounts into a Living Trust, have the accounts styled in the name of
the Trust, and have his wife, Marcy, receive all assets except for $600,000 to
be split between Settlor's children. In light of the extrinsic evidence that
conclusively establishes Settlor's intent, the Trust was rendered ambiguous and
summary judgment was proper. Consequently, we overrule Eckels and Davis's fourth
point.
C.  Eckels and Davis's
Objections to Marcy
and Welch's Summary
Judgment Evidence
       
In their second issue, Eckels and Davis argue that even if an ambiguity exists
in the Trust language, the particular extrinsic evidence utilized by Marcy and
Welch to evidence Settlor's intent was improper. Specifically, Eckels and Davis
argue that the testimony of Welch and his legal assistant, Kathy Boobar,(5)
regarding Settlor's intent was improper under Texas Rule of Civil Procedure
166a(c) because it was self-serving and not readily controvertible. See
Tex. R. Civ. P. 166a(c). Boobar, was employed by FFSS, and FFSS is not a party
to the lawsuit. Thus, Boobar was not an interested witness. Additionally, the
mere fact that testimony is from an interested witness does not necessarily make
the evidence an improper basis for summary judgment; rather, summary judgment is
proper if the evidence is clear, positive, direct, otherwise credible, free from
contradictions and inconsistencies, and could have been readily controverted. Trico
Techs. Corp. v. Montiel, 949 S.W.2d 308, 310 (Tex. 1997). Moreover, the
phrase "could have been readily controverted" does not mean that the
summary judgment evidence could have been easily and conveniently rebutted, but
rather indicates that the testimony could have been effectively countered by
opposing evidence. Id. Here, as suggested by Marcy and Welch, Eckels
and Davis could have deposed a representative of the custodian, Morgan Keegan,
in an effort to controvert Boobar and Welch's explanations for the change in the
account numbers. Thus, the court properly considered testimony of Welch and
Boobar, which was clear, positive, direct, otherwise credible, free from
contradictions and inconsistencies, and could have been readily controverted.
       
Eckels and Davis also contend that the affidavit and deposition testimony from
Welch and Boobar contravene the Dead Man's Rule. Marcy and Welch argue that any
such testimony was corroborated and therefore properly admitted. The Dead Man's
Rule mandates that neither party to the lawsuit shall be allowed to testify
against the other concerning any oral statement by the testator unless the
testimony or the oral statement is corroborated or the witness is called by the
opposite party to testify about the oral statement. Tex. R. Evid. 601(b). The
corroboration need not be sufficient on its own to support the verdict, but must
tend to confirm and strengthen the testimony of the witness and show the
probability of its truth. Powers v. McDaniel, 785 S.W.2d 915, 920 (Tex.
App.--San Antonio 1990, writ denied). Here, Welch's testimony was properly
corroborated by Boobar, a disinterested witness, and by Settlor's written
statements. See id. (stating that corroboration may come from any other
competent witness or other legal source, including documentary evidence).
Therefore, the testimony provided by Welch and Boobar through depositions and
affidavits was not inadmissible hearsay.
       
Eckels and Davis also argue that "other declarations" by Settlor, such
as letters he wrote before and after the creation of the Trust, are generally
inadmissible and should not have been considered by the trial court. They base
their argument on Tabassi v. NBC Bank--San Antonio, 737 S.W.2d 612
(Tex. App.--Austin 1987, writ ref'd n.r.e.) and First National Bank of
Galveston v. Trinity Protestant Episcopal Church of Galveston, 219 S.W.2d
828 (Tex. Civ. App.--Galveston 1949, no writ). These two cases are inapposite to
the present case because neither case involved a finding of latent ambiguity. But
see Stewart, 473 S.W.2d at 7 (finding that declarations by a testator
dealing with his intention may be received as an aid in resolving specific
problems of interpretation, such as equivocation or latent ambiguity).
       
Consequently, we hold that the trial court did not err by overruling Eckels and
Davis's objections to Marcy and Welch's summary judgment evidence. We overrule
Eckels and Davis's second issue.
V. Conclusion
       
Having held that the trial court properly granted summary judgment, we need not
address the remaining issues raised by Eckels and Davis. See Tex. R.
App. P. 47.1. We affirm the trial court's judgment.
 
   
                                                        SUE
WALKER
   
                                                        JUSTICE
 
PANEL B: HOLMAN, GARDNER, and WALKER, JJ.
DELIVERED: June 19, 2003

1.  The claims against Stuart Switzer Davis were
non-suited in the trial court, and he is not a party to this appeal.
2.  Settlor's will provided for the equal
distribution of his assets, one-third to Eckels, one-third to Davis, and
one-third to Marcy.
3.  A February 26, 1993 letter from Settlor to Welch
states:

 This is to thank you for completing my
 trust agreement ("The Living Trust").
 I do have a question as to how it
 relates to my present Will, if it, in fact, does. Or, will my Will need to be
 modified to conform with my objective to 1. leave a total of $600,000 in
 assets to my two children, divided equally, and thereby not subjected to
 estate taxes, and 2. leave the balance of my assets to my wife, Marcy.
 
 4.  Eckels and Davis argue that because accounts
 #1717 and #2095 co-existed for a time, this somehow defeats Settlor's intent.
 The summary judgment evidence, however, conclusively establishes Settlor's
 intent, regardless of the unilateral action of the management company.
 5.  Eckels and Davis also argue that Welch's
 attorney prevented Kathy Boobar from testifying fully at her deposition about
 the reason for creating Account #2095 because a lunch break was requested.
 Eckels and Davis do not point us to any reference in the record showing where
 they objected to this recess. Since private conferences may be held during
 agreed recesses and adjournments, we disagree that the lunch recess tainted
 Boobar's testimony. See Tex. R. Civ. P. 199.5(d).