**Petition for Writ of Mandamus Conditionally Granted, in Part, and Opinion filed April 2, 2024.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-23-00095-CV**

---

**IN RE ONCOR ELECTRIC DELIVERY CO. LLC; ONCOR ELECTRIC DELIVERY CO. NTU LLC; AEP TEXAS INC.; AMERICAN ELECTRIC POWER CO; CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC; AND CENTERPOINT ENERGY, INC., Relators**

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**281st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2021-41903**

## OPINION

In February 2021 Winter Storm Uri swept over Texas resulting in a record-setting demand for energy coupled with power shortages and electrical outages

across much of the state. After the storm, thousands of customers sued hundreds of companies participating in the Texas electricity market seeking damages related to power outages during the storm. The cases have been consolidated for pretrial proceedings before a multi-district litigation ("MDL") Court in Harris County.

This mandamus is brought by transmission and distribution utilities AEP Texas Inc.; American Electric Power Co., Inc.; CenterPoint Energy Houston Electric, LLC; CenterPoint Energy, Inc.; Oncor Electric Delivery Co., LLC; and Oncor Electric Delivery Co., NTU LLC (collectively "relators" or "TDUs"). *See* Tex. Gov't Code Ann. § 22.221; *see also* Tex. R. App. P. 52. In their petitions, the TDUs ask this Court to compel respondent, the Honorable Sylvia A. Matthews, presiding judge of the MDL Court, to vacate her January 26, 2023 orders to the extent respondent denied the TDUs' Rule 91a motions to dismiss.

We conditionally grant, in part, mandamus relief.

## I. Background

During Winter Storm Uri, the Electric Reliability Council of Texas ("ERCOT") escalated from a "Level 1 Emergency" to a "Level 3 Emergency" (the highest state of emergency) within the span of an hour on February 15, 2021. To address the Level 3 Emergency and to preserve the grid infrastructure, ERCOT ordered the TDUs to "load shed," or interrupt power, "to 'maintain frequency'

across the ERCOT system." The TDUs'[1] load shedding resulted in the interruption of electric service to millions of Texans.

Because winter weather conditions remained severe, ERCOT kept the Level 3 Emergency in effect for four days. On February 19, sufficient power generation came back online and ERCOT lifted the Level 3 Emergency, allowing TDUs—per ERCOT directives—to restore service to customers shut off under the load shed orders.

Thousands of customers filed hundreds of suits for damages arising from interruptions in electricity service or the failure to warn of the same. ERCOT moved to transfer and consolidate the cases into an MDL. The MDL Panel granted ERCOT's motion and created the Winter Storm Uri MDL pretrial court for all claims concerning "power shortages and electrical outages during Winter Storm URI." The parties agreed to proceed in the MDL with bellwether cases, four of which named TDUs as defendants—styled *Daniels, Peterman, Edwards, and Turner.*[2] Respondent stayed all cases and signed Case Management Order No. 1,

---

[1] Transmission and distribution utilities, or TDUs, take electricity generated by others (power generation companies) and transmit it through the TDUs' infrastructure, including power poles and electrical lines.

[2] The four bellwether cases are as follows:

1.    *Daniels v. CenterPoint Energy, Inc., et al.*, Cause No. 2021-18513, in the 281st Judicial District Court of Harris County, Texas ("Daniels");

2.    *Edwards, et al. v. ERCOT, Inc., et al.*, No. 2021-84438, in the 281st Judicial District Court of Harris County, Texas ("Edwards");

3.    *Peterman, et al. v. ERCOT, Inc., et al.*, Cause No. 2021-18532, in the 164th Judicial District Court of Harris County, Texas ("Peterman"); and

4.    *Turner, et al. v. NRG Texas Power, et al.*, Cause No. 2021-24797, in the 164th Judicial District Court of Harris County, Texas ("Turner").

which detailed a process by which defendants could file motions to dismiss the bellwether petitions.

In the bellwether petitions, the plaintiffs allege that defendants proximately caused their alleged injuries through purported negligence, gross negligence, tortious interference with plaintiffs' contracts with their retail electric providers, civil conspiracy, and infliction of a private nuisance. Under Texas Rule of Civil Procedure 91a, the TDUs moved to dismiss the four bellwether cases, asserting that the plaintiffs' claims lack any basis in law or fact. Plaintiffs amended their petitions, and the TDUs filed amended Rule 91a motions to dismiss. In their motions, the TDUs maintained that they are governed by tariffs and that Texas law precludes liability for service interruptions in emergency circumstances, such as Winter Storm Uri. Plaintiffs filed responses in opposition, maintaining that the tariffs do not abrogate the TDUs' common law duties. The TDUs filed replies in support of their motions to dismiss.

On January 26, 2023, respondent signed orders granting in part and denying in part the TDUs' amended Rule 91a motions to dismiss the petitions in the four bellwether cases. Respondent granted the TDUs' motion to dismiss with respect to plaintiffs' claims for tortious interference with a contract and for civil conspiracy, concert of action, and indivisible injury. Respondent denied the TDUs' motions to dismiss with respect to plaintiffs' claims for negligence, gross negligence, and nuisance. Additionally, respondent denied the TDUs permission to seek an interlocutory appeal.

4

The TDUs now seek mandamus review to the extent that respondent denied their Rule 91a motions. In their petition, the TDUs argue that the respondent erred as a matter of law in denying the TDUs' motions to dismiss as to plaintiffs' causes of action for negligence, gross negligence, and private nuisance in the four bellwether cases. The TDUs maintain that they are not liable for plaintiffs' alleged damages in light of Texas Supreme Court precedent and the comprehensive regulatory scheme, including the TDUs' tariffs for retail delivery service. The TDUs also contend that under Texas Supreme Court precedent, an alleged failure to supply electricity for delivery to retail consumers is not a nuisance injury, and plaintiffs' pleadings do not allege the elements of intentional, negligent, or strict liability nuisance, as required to recover for a such an injury. The TDUs further claim that, under Texas law, the discontinuation of electricity merely creates the condition by which alleged resulting injuries occur and is not the proximate cause of any injury to plaintiffs. Additionally, the TDUs assert that they have no adequate remedy by appeal if they are required to litigate the 230-plus suits in this MDL before obtaining appellate resolution of the threshold legal questions presented in their petition for writ of mandamus.

In their response, plaintiffs argue that TDUs' petition mischaracterizes plaintiffs' pleadings. Plaintiffs maintain that Rule 91a dismissal cannot be based upon twisting or contradicting plaintiffs' pleadings when at this stage in the proceedings, plaintiffs' allegations are to be taken as true by the court and accorded all reasonable inferences that may be drawn therefrom. Plaintiffs assert that the filed-rate doctrine, also known as the filed-tariff doctrine, does not entitle

the TDUs to dismissal. Plaintiffs contend that a tariff's applicability and reasonableness cannot be determined at the pleadings stage. Plaintiffs further argue that, even if a tariff is found to be applicable and presumed reasonable, the presumption is rebuttable, and fails the "take Plaintiffs' pleadings as true" test of Rule 91a and fails the "one rational decision" prong of the two-pronged mandamus standard. Additionally, plaintiffs assert that the tariffs do not shield the TDUs from liability from their gross negligence, intentional acts, or non-good faith compliance with ERCOT orders. With respect to the TDUs' contention that plaintiffs' do not adequately allege a nuisance injury, plaintiffs argue that contention is contradicted by case law relied upon by the TDUs. Plaintiffs maintain they adequately allege that the TDUs knew that substantial interference with plaintiffs' use and enjoyment of their property was substantially certain to result from depriving them of electricity—and thus heat and potable water—during severe winter conditions.

## II.    Standard of Review

Mandamus relief is appropriate when a trial court abuses its discretion in denying a Rule 91a motion to dismiss. *In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.3d 261, 266 (Tex. 2021) (orig. proceeding). To establish entitlement to mandamus relief in this context, the TDUs must demonstrate (1) that respondent abused her discretion by denying their Rule 91a motions, and (2) the TDUs have no adequate remedy by appeal. *See In re Essex*, 450 S.W.3d 524, 526 (Tex. 2014) (per curiam) (orig. proceeding).

Rule 91a of the Texas Rules of Civil Procedure provides that a party "may move to dismiss a cause of action on the grounds that it has no basis in law or fact." *See Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 654 (Tex. 2020) (quoting Tex. R. Civ. P. 91a.1). "A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." *Id.* "A cause of action has no basis in fact if no reasonable person could believe the facts pleaded." *Id.* In reaching its determination, "the court may not consider evidence . . . and must decide the motion based solely on the pleading of the cause of action, together with any pleading exhibits permitted by Rule 59." *In re First Rsrv. Mgmt., L.P.*, 671 S.W.3d 653, 659-60 & n.16 (Tex. 2023) (orig. proceeding) (quoting Tex. R. Civ. P. 91a.6). We review the merits of a Rule 91a motion de novo. *Bethel*, 595 S.W.3d at 654 (citing *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016) (per curiam).

## III.   Analysis

### A.   Whether respondent abused her discretion by denying the TDUs' Rule 91a motions?

#### 1.   Filed-rate doctrine

The "filed-rate" or "filed-tariff" doctrine applies when state law creates a state agency and a statutory scheme under which the agency determines reasonable rates for the service provided. *See S.W. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 216 (Tex. 2002). A tariff filed with and approved by an administrative agency under a statutory scheme is presumed reasonable unless a litigant proves otherwise.

*CenterPoint Energy Res. Corp. v. Ramirez*, 640 S.W.3d 205, 212 & n.30 (Tex. 2022) (citing *Grant*, 73 S.W.3d at 216).  Filed tariffs govern a utility's relationship with its customers and have the binding force and effect of law until suspended or set aside.  *See id*. & n.32 (citing *Grant*, 73 S.W.3d at 217).  Consequently, the filed-rate doctrine prohibits a customer from suing a utility in contract or tort over issues governed by the terms of a publicly filed tariff.  *See Grant*, 73 S.W.3d at 217.

### 2.      The TDUs' tariff

TDUs provide electricity subject to the terms of a tariff.  *See* 16 Tex. Admin. Code § 25.214(b).  "Each tariff filed with the PUC [Public Utility Commission] contains certain provisions that are specific to the filing utility."  *City of Richardson v. Oncor Elec. Delivery Co., LLC*, 539 S.W.3d 252, 257 (Tex. 2018).  The PUC's rules, however, also contain a "pro-forma tariff," the provisions of which must be incorporated exactly as written into each utility's tariff.  *Id*. (citing 16 Tex. Admin. Code § 25.214(b)–(d)).  "In other words, every TDU in the state has the same pro-forma tariff provisions in their filed tariff."  *Id*. at 257-58.

Section 5.2. of the TDUs' pro forma tariff, which limits the TDUs' liability, is at issue in this case.:

- **5.2.1  Liability between company and retail customers**

This Tariff is not intended to limit the liability of Company or Retail Customer for damages except as expressly provided in this Tariff.

8

*Company will make reasonable provisions to supply steady and continuous Delivery Service, but does not guarantee the Delivery Service against fluctuations or interruptions. Company will not be liable for any damages, whether direct or consequential, including, without limitation, loss of profits, loss of revenue, or loss of production capacity, occasioned by fluctuations or interruptions unless it be shown that Company has not made reasonable provision to supply steady and continuous Delivery Service, consistent with the Retail Customer's class of service, and in the event of a failure to make such reasonable provisions, whether as a result of negligence or otherwise, Company's liability shall be limited to the cost of necessary repairs of physical damage proximately caused by the service failure to those electrical delivery facilities of Retail Customer which were then equipped with the protective safeguards recommended or required by the then current edition of the National Electrical Code.*

*Company will make reasonable provisions to provide Construction Service, but does not guarantee the timeliness of initiating or completing such Construction Service nor the suitability of such facilities for Retail Customer's specific uses. Company will not be liable for any damages, whether direct or consequential, including, without limitation, loss of profits, loss of revenue, or loss of production capacity, occasioned by the failure to provide timely or suitable Construction Service. The term "Construction Service" in this paragraph includes any and all services that (a) are provided, (b) fail to be provided, or (c) fail to be timely provided by Company, from the time Retail Customer first contacts Company with respect to the provision of any type of Construction or Delivery Service.*

However, if damages result from failure to provide timely or suitable Construction Service or fluctuations or interruptions in Delivery Service that are caused by Company's or Retail Customer's gross negligence or intentional misconduct, this Tariff shall not preclude recovery of appropriate damages when legally due.

- **5.2.2 Limitation of duty and liability of competitive retailer**

*Competitive Retailer has no ownership, right of control, or duty to Company, Retail Customer or other third party, regarding the design, construction or operation of Company's Delivery System. Competitive Retailer shall not be liable to any person or entity for any damages, direct, indirect or consequential, including, but without limitation, loss of business, loss of profits or revenue, or loss of production capacity, occasioned by any fluctuations or interruptions of Delivery Service caused, in whole or in part, by the design, construction or operation of Company's Delivery System.*

- **5.2.4 Force majeure**

*Neither Company nor Competitive Retailer shall be liable for damages for any act or event that is beyond such party's control and which could not be reasonably anticipated and prevented through the use of reasonable measures, including, but not limited to, an act of God, act of the public enemy, act of terrorism, war, insurrection, riot, fire, explosion, labor disturbance or strike, wildlife, unavoidable accident, equipment or material shortage, breakdown or accident to machinery or equipment, or good-faith compliance with a then valid curtailment, order, regulation or restriction imposed by governmental, military, or lawfully established civilian authorities, including any order or directive of the Independent Organization.*

- **5.2.5 Emergencies and necessary interruptions**

Company may curtail, reduce voltage, or interrupt Delivery Service in the event of an emergency arising anywhere on the Delivery System or the interconnected systems of which it is a part, when the emergency poses a threat to the integrity of its system or the systems to which it is directly or indirectly connected if, in its sole judgment, such action may prevent or alleviate the emergency condition. Company interrupt service when necessary, in Company's sole

judgment, for inspection, test, repair, or changes in Company's Delivery System, or when such interruption will lessen or remove possible danger to life or property, or will aid in the restoration of Delivery Service.

Company shall provide advance notice to Retail Customer's Competitive Retailer, if reasonably possible. Such notice may be made by notice to all certificated Competitive Retailers operating within Company's service territory, specifically identifying the location, time, and expected duration of outage. Notice shall also be provided, if reasonably possible, to those Retail Customers designated as Critical Care Residential Customers, Chronic Care Residential Customers, Critical Load Industrial Customers, and Critical Load Public Safety Customers. If Retail Customer believes it qualifies for designation as a Critical Care Residential Customer, Chronic Care Residential Customer, Critical Load Industrial Customer, or Critical Load Public Safety Customer under P.U.C. SUBST. R. 25.497, Retail Customer may apply for designation as provided in P.U.C. SUBST. R. 25.497.

Nothing herein shall prevent the Company from being liable if found to be grossly negligent or to have committed intentional misconduct with respect to its exercise of its authority in this Tariff.

The operation of BPL shall not interfere with or diminish the reliability of Company's Delivery System. Should a disruption in the provision of Delivery Service occur due to BPL, Company shall prioritize restoration of Delivery Service prior restoration of BPL-related systems.

*See* 16 Tex. Admin. Code § 25.214(d) (Pro-forma retail delivery tariff. Tariff for retail delivery service) (emphasis in original).

### 3. Whether courts can consider the tariffs and filed-rate doctrine on a Rule 91a motion?

As a matter of first impression, we must decide whether courts can consider the tariff and filed-rate doctrine on a Rule 91a motion to dismiss. Plaintiffs argue that courts are prohibited from considering anything other than plaintiffs' pleadings, maintaining that the tariff does not apply if it is unreasonable, and according to plaintiffs' argument, a tariff's reasonableness and applicability cannot be decided at the pleadings stage. We disagree.

It is undisputed that each TDU is bound by a publicly-filed tariff and that "[t]he filed-rate doctrine prohibits a customer from suing a utility in [] tort" over an issue that the "publicly-filed tariff's terms govern." *Grant*, 73 S.W.3d at 217. Additionally, it is undisputed that the tariffs are presumed reasonable unless a litigant proves otherwise. *Ramirez*, 640 S.W.3d at 212 & n. 30 (citing *Grant*, 73 S.W.3d at 216). The tariffs "have the force and effect of law." *Grant*, 73 S.W.3d at 222.

As set forth, *supra*, under Rule 91a, a baseless cause of action is dismissed at the pleadings stage "if the allegations, taken as true, together with inferences reasonably drawn from them do not entitle the claimant to the relief sought." Tex. R. Civ. P. 91a. The tariff provisions on which the TDUs rely in their motions to dismiss are legally required by Section 25.214 of the Administrative Code to be included "exactly as written." *See* Tex. Admin. Code § 25.214(b). Moreover, the pro forma tariff is made part of the Administrative Code. *Id*. at § 25.214(d). Plaintiffs neither pleaded that the tariffs are unreasonable, nor did they contend that

12

the tariffs are unreasonable based on the facts alleged in their petitions. Because plaintiffs fail to allege facts to rebut the presumption of reasonableness, we conclude that courts should consider the tariffs and the filed-rate doctrine when determining a Rule 91a motion to dismiss.

### 4. Negligence claims

"The threshold inquiry in a negligence case is duty." *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 145 & n.25 (Tex. 2022) (quoting *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)). The existence of duty is a "question of law for the court to decide from the facts surrounding the occurrence at issue." *Id*. at 145 & n.27 (quoting *Phillips*, 801 S.W.2d at 525). If there is no duty of care, there is no viable lawsuit based on negligence. "The nonexistence of a duty ends the inquiry into whether negligence liability may be imposed." *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998).

In this case, plaintiffs do not allege a violation of the tariffs;[3] thus, plaintiffs must establish an applicable duty under common law. Under the facts as pleaded by plaintiffs, the TDUs were negligent in interrupting electricity in response to

---

[3] Additionally, plaintiffs do not attempt to the make a showing that the TDUs' tariff's liability limits are unreasonable. Applying the filed-rate doctrine, the Texas Supreme Court has determined that:

> a tariff's limitation on liability for economic damages is reasonable because a utility: (1) must provide nondiscriminatory service to all customers within its area; (2) must maintain uniform rates and reduce costs; (3) cannot accurately estimate its exposure to damages or efficiently insure against risks; (4) cannot increase rates for all customers based on losses one specific class of customers incurs; and (5) must comply with PUC regulations.

*Grant*, 73 S.W.3d at 217 (citing *Houston Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668, 673-75 (Tex 1999).

ERCOT's Level 3 Emergency declaration and emergency load shed orders. The TDUs' tariff, however, provides under Section 5.2.5, entitled "Emergencies and Necessary Interruptions," that the TDU "may . . . interrupt Delivery Service in the event of an emergency . . . if, in its sole judgment, such action may prevent or alleviate the emergency condition." 16 Tex. Admin. Code § 25.214(d) (tariff § 5.2.5). By its terms, Section 5.2.5 precludes a common-law duty that would control how a TDU interrupts electricity service to resolve an emergency such as Winter Storm Uri. *See Grant*, 73 S.W.3d at 217 ("[A] utility's obligations to its customers cannot exceed its duties under a filed tariff.").

The TDUs were entitled to dismissal of the plaintiffs' claims for negligence because Texas law does not impose on TDUs common-law negligence duties associated with emergency load shedding, ensuring adequate generation, or warning of anticipated power outages. The plain language of the tariff bars the TDUs' liability for ordinary negligence. *See Grant*, 73 S.W.3d at 217 ("aggrieved customers cannot enforce alleged rights that contradict the tariff's provisions"). Accordingly, we conclude that the respondent abused her discretion in denying the TDUs' motions to dismiss the plaintiffs' negligence claims.

### 5.    Gross negligence or intentional misconduct claims

The TDUs' tariff does not shield the TDUs from gross negligence or intentional misconduct. Section 5.2.1 provides that "if damages result from . . . fluctuations or interruptions in Delivery Service that are caused by [TDU's] gross negligence or intentional misconduct, this Tariff shall not preclude recovery of appropriate damages when legally due." 16 Tex. Admin. Code 25.214(d) (tariff

14

§ 5.2.1). Additionally, Section 5.2.5 provides that "[n]othing herein shall prevent the Company from being liable if found to be grossly negligent or to have committed intentional misconduct with respect to its exercise of its authority in this Tariff." *Id*. (tariff § 5.2.5).

The TDUs argue, however, that Section 5.2.4, the force majeure provision of the TDUs' tariff, bars plaintiffs' gross negligence and intentional misconduct claims. The TDUs' contend that "the force majeure provision does not distinguish among theories of liability but broadly exculpates TDUs from damages that come within the force majeure definition." While Section 5.2.4 does exclude liability for damages "for any act or event that is beyond such party's control and which could not be reasonably anticipated and prevented through the use of reasonable measures," plaintiffs' core allegations against the TDUs complain of the manner that the TDUs executed the load shed orders. Plaintiffs pleaded that "[t]his catastrophe was not caused by an act of God, but instead was caused by intentional decisions by individual Defendants made both before and during Winter Storm Uri that were known to other Defendants and caused multiple operational failures which combined to cause the failure of the ERCOT grid." Plaintiffs assert numerous allegations of mismanagement by the TDUs in responding to the ERCOT load shed orders that they contend constitute gross negligence, including the following:

- the TDUs decided where to cut power and whether to rotate outages.

- the TDUs refused to follow any plan for load shedding and instead flipped switches without foresight or concern.

- the TDUs had the power to flip switches back on after turning them off.

- the TDUs favored some neighborhoods over others.

- the TDUs made the power shortage worse by cutting power to customers producing power (*e.g.*, Permian Basin) after being warned a decade earlier in the 2011 Federal Energy Regulatory Commission ("FERC") report not to shut off industrial users that would cause loss of generation capacity.

- the TDUs falsely promised a "plan" of rolling blackouts of 15-45 minutes in duration and in no event longer than 12 hours.

- the TDUs made the power shortage worse because the amount of load connected to the Under Frequency Load Shed ("UFLS") circuits by the TDUs substantially exceeded the ERCOT-required levels.

- the TDUs' customer communications misleadingly downplayed the catastrophe when they were warned that conditions would be far worse, with one TDU apologizing for what it had done wrong.

They have alleged that the TDU's conduct, when viewed objectively from the standpoint of the TDUs, at the time of its occurrence, involved an extreme degree of risk, considering the nature of the risk and the probability and magnitude of potential harm to others, of which the TDUs had actual, subjective awareness but nevertheless proceeded with conscious indifference to the rights, safety, and

welfare of others. These are essential allegations to support a gross negligence claim.

Because the plaintiffs sufficiently pleaded and the TDUs failed to negate plaintiffs' gross negligence or intentional misconduct claims, we conclude respondent did not abuse her discretion by denying the TDUs' motions to dismiss these claims.

### 6.    Private nuisance claims

The Texas Supreme Court has stated that "the term 'nuisance' refers not to a cause of action . . . but to the legal injury . . . that gives rise to the cause of action." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 604 (Tex. 2016). A defendant can be liable for causing a nuisance if the defendant intentionally causes it, negligently causes it, or—in limited circumstances—causes it by engaging in abnormally dangerous or ultra-hazardous activities. *Id*. at 604-09; *see also Dealer Computer Servs., Inc. v. DCT Hollister Rd., LLC*, 574 S.W.3d 610, 623-24 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (explaining that "three different causes of action may lead to liability for a nuisance injury: (1) intentional conduct causing a nuisance, referred to by the court as 'intentional nuisance'; (2) negligence; and (3) abnormally dangerous or ultra-hazardous activities causing a nuisance, referred to by the [Texas Supreme] court as 'strict-liability nuisance.'").

Here, the plaintiffs allege all three of these categories of nuisance in their private nuisance claims against the TDUs. According to plaintiffs, the TDUs' intentional and negligent acts and omissions created both a negligent nuisance and an intentional nuisance. Additionally, plaintiffs allege that the TDUs are strictly

17

liable because their acts and omissions that substantially interfered with plaintiffs' use and enjoyment of their properties were abnormally dangerous.

### a. Negligent nuisance claim

A negligently caused nuisance claim is governed by ordinary negligence principles. *Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 607. The elements the plaintiffs must prove are "the existence of a legal duty, a breach of that duty, and damages proximately causes by the breach." *Id*. The only unique element, which derives from the nature of the legal injury on which the plaintiff bases the claim, is the burden to prove that the defendant's negligent conduct caused a nuisance, which in turn resulted in the plaintiff's damages. *See id*.

As set forth, *supra*, we have determined that the plaintiffs' ordinary negligence claims are foreclosed by the tariffs; thus, under Texas jurisprudence, plaintiffs' claims for negligent nuisance have no basis in law. We conclude that the respondent abused her discretion in denying the TDUs' motions to dismiss the plaintiffs' claims for negligent nuisance.

### b. Intentional and strict-liability nuisance claims

Unlike a negligent nuisance claim, intentional nuisance and strict-liability nuisance claims do not require proof of the legal duty owed. *Id*. at 605.

### (i). Intentional nuisance

"[T]o prove an intentional nuisance, the evidence must establish that the defendant intentionally caused the interference that constitutes the nuisance, not just that the defendant intentionally engaged in the conduct that caused the

18

interference." *Id*. (citing *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985) (explaining that intent exists if the actor desires to cause the "consequences" of his act, or the actor knows that the "consequences" are substantially certain to result). In sum, "the requirement for an intentional nuisance is that the effects of the substantial interference be unreasonable (thus, that there be a nuisance), not that the defendant's conduct be unreasonable." *Id*. at 606.

Because plaintiffs pled facts that could rise to the level of intentionally causing the interference that constitutes the nuisance, we conclude that the respondent did not abuse her discretion in denying the TDUs' motions to dismiss the plaintiffs' claims of intentional nuisance.

### (ii). Strict-liability nuisance

"[T]o the extent that a strict-liability-nuisance claim exists in Texas based on a nuisance created by 'abnormal and out of place conduct,' it arises only out of conduct that constitutes an "abnormally dangerous activity" or involves an abnormally 'dangerous substance' that creates a 'high degree of risk' of serious injury." *Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 609. It is not just an activity that is "abnormal and out of place in its surroundings." *Id*. at 617 (citations omitted).

Here, plaintiffs' pleadings are insufficient to raise a question of fact as to whether the alleged interference resulted from abnormally dangerous or ultra-hazardous conduct by the TDUs. As acknowledged by the Restatement, "the transmission of electricity . . . [is not] deemed to be an abnormally dangerous activity." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL

19

& EMOTIONAL HARM § 20 cmt. h (Am. L. Inst. 2010). Plaintiffs cite no Texas court case that has held that the transmission or distribution of electricity is an abnormally dangerous activity giving rise to a nuisance injury for which a defendant is strictly liable. As such, the trial court abused its discretion in denying the TDUs' motions to dismiss plaintiffs' strict-liability nuisance claims.

## B. The TDUs other arguments

The TDU has made other arguments about causation and damages that we do not believe should be reviewed via a Rule 91a motion.

## IV. TDUs have no adequate remedy by appeal

Having determined that respondent abused her discretion by denying dismissal of plaintiffs' claims for negligence and nuisance, we must now determine whether the TDUs have demonstrated they have no adequate remedy by appeal. *See Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992) (orig. proceeding).

"'The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments.'" *Essex Ins. Co.*, 450 S.W.3d at 528 (quoting *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008)). Balancing these interests, the Texas Supreme Court has held that "mandamus relief is appropriate to spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *Essex Ins. Co.*, 450 S.W.3d at 528 (internal citations omitted).

"When 'the very act of proceeding to trial—regardless of the outcome—would defeat the substantive right involved' or would cause a knowing waste of

20

resources, mandamus relief may be necessary." *In re Illinois Nat'l Ins. Co.*, No. 22-0872, ___S.W.3d ___, 2024 WL 736751, at *10 (Tex. Feb. 23, 2024) (orig. proceeding) (quoting *In re McAllen Med. Ctr.,* 275 S.W.3d 458, 465–66 (Tex. 2008) (orig. proceeding) ("[s]itting on our hands while unnecessary costs mount up contributes to public complaints that the civil justice system is expensive and outmoded."); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 137 (Tex. 2004) (orig. proceeding) (stating that in some circumstances "the irreversible waste of judicial and public resources that would be required" absent mandamus relief justifies granting such relief (quoting *In re Masonite Corp.*, 997 S.W.2d 194, 198 (Tex. 1999) (orig. proceeding))).

We conclude that the TDUs have demonstrated that this case presents extraordinary circumstances warranting review of the threshold legal questions and mandamus relief, saving the courts and the parties the expense of protracted discovery and litigation in an expansive MDL. *See Essex Ins. Co.*, 450 S.W.3d at 528.

## V.  Conclusion

We conditionally grant, in part, the TDUs' petition for writ of mandamus. We vacate the respondent's January 26, 2023 orders in the four bellwether cases to the extent respondent denied the TDUs' Rule 91a motions to dismiss plaintiffs' claims for negligence and negligent nuisance. We direct the respondent to grant the TDUs' Rule 91a motions to dismiss the plaintiffs' claims for negligence, negligent nuisance, and strict-liability nuisance in the four bellwether petitions. Our writ will issue only if the respondent fails to comply with this opinion.

/s/ Tracy Christopher
   Chief Justice


Panel consists of Chief Justice Christopher and Justices Jewell and Wilson.